194

AMERICANS UNITED FOR SEPARATION OF CHURCH AND STATE; Robert L. Maddox, Individually and as Executive Director of Americans United for Separation of Church and State; American Baptist Churches In the U.S.A.; Robert C. Campbell, Individually and as General Secretary of the American Baptist Churches in the U.S.A.; American Council of Christian Churches of California; Edgar R. Koons, Individually and as President of the American Council of Christian Churches of California; American Humanist Association; Frederick Edwards, Individually and as Executive Director of the American Humanist Association; Church of the Brethren; Robert W. Neff, Individually and as General Secretary of the Church of the Brethren; Council on Religious and Civil Liberty; Institute of Women Today; the National Association of Evangelicals; Billy A. Melvin, Individually and as Executive Director of the National Association of Evangelicals; National Association of Laity; Joseph T Skehan, Individually and as President of the National Association of Laity; National Council of the Churches of Christ In the U.S.A.; Bishop Philip Cousin, Individually and as President of the National Council of the Churches of Christ in the U.S.A.; the National Coalition of American Nuns; Ohio Association For Public Education and Religious Liberty; G. Weir Hartman, Individually and as Executive Director of Ohio Association for Public Education and Religious Liberty; Presbyterian Church (U.S.A.); Progressive National Baptist Convention, Inc.; C.J. Malloy, Jr., Individually and as General Secretary of the Progressive National Baptist Convention, Inc.; Unitarian Universalist Association; Unitarian Universalists For Religious Freedom; Ken Gjemre, Individually and as Chair of Unitarian Unitarian Universalists for Religious Freedom; High Woods Reformed Church; Right Rev. H. Coleman McGehee, Jr.; James Mankin; Gary M. Beauchamp; Gaston D. Cogdell; P.D. Wilmeth; J.P. Sanders; James J. Brown; W.L. Lumpkin; Robert D. Hughes; Robert A. Parker; Alton H. McEachern; E. Mallary Binns; James A. Langley; Malcom G. Lunceford; Charles H. Ashcraft; Rudy A. Pulido; C. Welton Gaddy; Ira H. Peak, Jr.; James Leo Garrett, Jr.; Paul Griffin Jones, II; Leon Hyatt, Jr.; Phil Dowell Strickland; Rabbi Balfour Brickner; Larry L. Lewis; Bernard F. Didier; James P. Archibald; William V. Wiist; R. Lee Kretz; Mitchell A. Tyner; Willis Adams; Edwin E.G. Shafer; Gordon W. Zutz; Edd Doerr; David D. Van Strien; Theodore A. Webb; James F. Hornback; David M. Howard; L.J. Peterson; Ronald B. Flowers; Norman J. Bauer; Fred Schwengel; Glen A. Holman; Augusta P. Finkelstein; Carolyn E. Morgan; Mary Lee S. O'Neal; Mary Beth Beck; Walter B. Pontynen, Jr.; James C. Weydert; Lynn L. Weydert; Mickie L. Weydert; Bernice G. George; Barbara Moon; Wilbur F. Hermance; Florida S. Eschenbach; Jewel E. Morrison; Stewart M.L. Pollard; Wendell Phillips Berwick; C.R. Caley; Charles H. Sumner; Lea W. Clayton, Jr.; Albert R. Dilley; Francis W. Hensley; Robert R. Tilitz; Mario Cuniberti; James T. McCollum; W.B. Tichenor; Carolina C. Capistrano; Alvin W. Stuart; John V. Stevens, Sr.; Harry F. Michaels; Baptist General Association of Virginia; Adventist Laymen's Foundation of Arkansas; Adventist Laymens' Foundation of Mississippi, Appellants,

v.

Ronald W. REAGAN, As President of the United States of America; United States of America; George P. Shultz, As Secretary of State; Department of State; James A. Baker, As Secretary of the Treasury; Department of the Treasury; and William A. Wilson, as the United States Ambassador to the Holy See.

No. 85–1309.

United States Court of Appeals, Third Circuit.

Argued Jan. 16, 1986.

Decided March 21, 1986.

Rehearing and Rehearing En Banc Denied April 25, 1986.

Lee Boothby (argued), Berrien Springs, Mich., Earl W. Trent, Jr., American Baptist Churches in the U.S.A., Valley Forge, Pa., for appellants; Walter E. Carson, Forest Montgomery, Washington, D.C., of counsel.

Richard K. Willard, Acting Asst. Atty. Gen., Edward S.G. Dennis, Jr., U.S. Atty., Leonard Schaitman, Paul Blankenstein, Nicholas S. Zeppos, James M. Spears (argued), Attys., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for appellees.

Before SEITZ and GIBBONS, Circuit Judges and GERRY, District Judge.*

**OPINION OF THE COURT**

GIBBONS, Circuit Judge:

Americans United for Separation of Church and State and others appeal from a judgment dismissing their amended com-

* Hon. John F. Gerry, United States District Judge for the District of New Jersey, sitting by desig-

plaint against the President of the United States, the Secretary of the Treasury, and the United States Ambassador to the Vatican. The complaint sought declarations (1) that congressional actions consenting to the appointment of and funding for a diplomatic mission to the Vatican violate the first amendment and (2) that the President's actions in extending diplomatic recognition to the Vatican—sending an ambassador to and receiving an ambassador from the Vatican—exceed the President's article II powers and violate both the first amendment and the liberty clause of the fifth amendment. The complaint sought a permanent injunction against funding of the diplomatic mission to the Vatican and an order enjoining the Ambassador from engaging in ambassadorial activity. The district court granted the defendants' Rule 12(b) motion to dismiss on the grounds that the plaintiffs lacked standing and that the controversy was not justiciable. We affirm.

I.

The Complaint

The amended complaint alleges that Americans United for Separation of Church and State is a nonprofit corporation formed to maintain and advance civil and religious liberties through the enforcement of the rights and privileges of the Constitution. Other plaintiffs included twenty organizations that may be loosely defined as religious, twelve officials of those organizations, and seventy-one individual members of the clergy of various demoninations. It is alleged that each individual plaintiff is a citizen, a federal taxpayer, and a voter.

According to the complaint the United States appointed a consul to the Papal States on June 26, 1797, and that in 1847 formal diplomatic relations beyond the consular level were established. That relationship continued until 1867 when a controversy arose over the prohibition in the City of

nation.

Rome of public worship by non-Roman Catholic denominations. Reacting to that controversy, Congress, in "An Act Making Appropriations for the Consular and Diplomatic Expenses of the Government for the Year ending thirtieth June eighteen hundred and sixty-eight, and for other Purposes," legislated that "no money hereby or otherwise appropriated shall be paid for the support of an American legation at Rome, from and after the thirtieth day of June, eighteen hundred and sixty-seven." Act of Feb. 28, 1867, ch. 99, 14 Stat. 412, 413. As a result of that legislation the United States terminated diplomatic relations with the Papal States.

In 1873 the modern Kingdom of Italy annexed the Papal States. In 1929, however, in the Lateran Treaty, the Kingdom of Italy recognized the "State of the City of the Vatican" while the Holy See renounced its claims over territory outside the Vatican City. The present State of the City of the Vatican is comprised of 108 acres of territory and has a population slightly in excess of 1000. Located in that territory is the world headquarters of the Roman Catholic Church.

It is alleged that beginning in 1939, and from time to time thereafter until 1984, several Presidents of the United States designated personal representatives to the Vatican. These personal representatives served without salary and were not subject to Senate confirmation.

On November 22, 1983 Congress repealed the restriction, contained in the 1867 Act, against expenditures for the support of the American Legation at Rome. *See* Act of Nov. 22, 1983, Pub.L. No. 98–164, § 134, 1983 U.S.Code Cong. & Ad.News (97 Stat.) 1017, 1029. At that time William A. Wilson was serving as President Ronald W. Reagan's personal representative. On January 10, 1984 President Reagan announced he would nominate Mr. Wilson as United States Ambassador to the Vatican; the Senate confirmed Mr. Wilson as Ambassador on March 7, 1984. Pursuant to general legislation dealing with the support of diplomatic missions, the State Department designated funds for Mr. Wilson's salary and for other expenses relating to the support of the mission to the Vatican.

The amended complaint alleges that the receipt of a diplomatic representative from, or the appointment of a diplomatic representative to, the Vatican violates the powers granted the President by article II of the Constitution, in that the Vatican is not a state upon which the President may confer diplomatic recognition. It alleges further that the establishment of diplomatic relations with the Vatican amounts to an establishment of religion in violation of the establishment clause of the first amendment. Finally, it alleges that the establishment of diplomatic relations constitutes a special preference of one religious group over others in violation of the equal protection component of due process clause of the fifth amendment.

Addressing their standing to litigate the foregoing constitutional issues, the plaintiffs alleged in paragraph ninety-five of their amended complaint that, in addition to the alleged injury they have suffered as taxpayers, they have suffered particularized injury in fact in that (a) they have been denied equal access to the Executive Branch of the United States Government because one denomination will have access through someone enjoying diplomatic status while they will have access only as citizens and religious leaders conversing with the President; (b) "the spiritual and moral teachings and beliefs of one church which asserts certain of those beliefs in the political arena of the United States will have a continuing relationship with the United States Government ..."; (c) the symbolic preference for the Roman Catholic Church implicit in the United States Government's diplomatic recognition of the Vatican will enhance the ability of that church to compete in the religious marketplace; (d) the diplomatic relations will lead to interference by the President in the internal affairs of the Roman Catholic Church in the United States to the detriment of the church's members; (e) the establishment of diplomatic relations confers

on the person designated by the Vatican as Papal Nuncio to the United States the benefits of the privileges and immunities of the statutes protecting diplomats (22 U.S.C. §§ 254a–e, 256–258(a) (1982 & Supp. I 1983)) and the protections of the Vienna Convention on Diplomatic Relations (Apr. 18, 1961, 23 U.S.T. 2339, T.I.A.S. No. 7502) while no other clergy are so protected; (f) plaintiffs are subjected to indirect pressure to conform to an unspecified governmental policy that flows from the diplomatic relationship; (g) plaintiffs, not enjoying diplomatic relations, "are seen as second-class citizens, subscribing to religions of lesser worth"; and (h) the fusion of the United States' political interests with the religious position of the papal leadership brought about by the diplomatic relationship jeopardizes in an unspecified way "the foreign mission work" of the plaintiffs.

## II.

### The District Court Ruling

The district court dismissed the complaint for two independent reasons. First, the court ruled, no plaintiff alleged the kind of particularized injury that would permit judicial recognition of standing to litigate the tendered constitutional issues. Second, even assuming that some plaintiff had the requisite standing, questions of diplomatic relations are committed by the Constitution to final decision by the Executive Branch and thus present nonjusticiable political questions.

## III.

### Discussion

█ We start with two palpable facts pleaded in the complaint. The State of the City of the Vatican is a territorial sovereignty, however small its size and population. The head of the Roman Catholic Church controls the government of that sovereign territory. No other religious organization that is a plaintiff, or in which individual plaintiffs are members, is sim-

ilarly situated. If the Roman Catholic Church's unique position of control of a sovereign territory gives it certain advantages that other religious organizations do not enjoy, those advantages cannot be the concern of the constitutional provisions upon which the plaintiffs rely.[1] Consequently, in prosecuting their complaint, the plaintiffs must rely upon actions by the President and Congress that cause injury to them in some manner different from and independent of the disadvantages that result from the unique status of the Vatican in the world community. With that thought in mind we turn to the issue whether the district court properly dismissed the complaint.

### A. Standing

The plaintiffs assert standing in three capacities: as taxpayers, as citizens and voters, and as victims of stigmatization. Although their complaint is not specific in this respect, we read it to allege that as taxpayers they have standing to challenge expenditures for the payment of Mr. Wilson's salary and the cost of maintaining the embassy he occupies; that as citizens they have standing to insist that the court order the President to observe the Constitution; and that as religious organizations and members thereof they have standing to challenge Executive Branch action that stigmatizes all noncatholic churches and their members. We address each allegation.

#### 1. Taxpayer Standing

█ The basic rule with respect to the standing of federal taxpayers to challenge expenditures of funds by the federal government is that laid down many years ago in *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). Noting that "[t]he right of a taxpayer to enjoin the execution of a federal appropriation act, on the ground that it is invalid and will result in taxation for illegal purposes, has never been passed upon by this Court,"

---

**1.** Because the Vatican is so situated, the question of whether the President may constitution-

ally establish diplomatic relations with a church *qua* church is not presented by this action.

*id.* at 486, 43 S.Ct. at 600, Justice Sutherland addressed that question. Holding that individual taxpayers lack standing to seek such relief, he explained,

> We have no power *per se* to review and annul acts of Congress on the ground that they are unconstitutional. That question may be considered only when the justification of some direct injury suffered or threatened, presenting a justiciable issue, is made to rest upon such an act. Then the power exercised is that of ascertaining and declaring the law applicable to the controversy. It amounts to little more than the negative power to disregard an unconstitutional enactment, which otherwise would stand in the way of the enforcement of a legal right. The party who invokes the power must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.

*Id.* at 488, 43 S.Ct. at 601.

The plaintiffs urge, however, that the basic *Frothingham* rule does not control the standing issue in this case, suggesting instead that they qualify for the exception, articulated in *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), covering challenges to federal expenditures for the establishment of religion. Although the *Flast* exception represents a significant departure from the *Frothingham* rule, Chief Justice Warren's opinion in the former case identifies clear limits to the exception. The plaintiffs in *Flast*, rather than challenging expenditures bearing on activities committed to federal regulation by articles I and II of the Constitution, instead challenged expenditures authorized solely by the general welfare provision in the taxing and spending clause (U.S. Const., art. I, § 8, cl. 1). In *Flast* the Court held that the general welfare clause does not authorize direct financial support of religious schools. But the Chief Justice carefully confined the taxpayer standing exception he recognized, writing,

The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to challenge the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute.... Secondly, the taxpayer must establish the nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the power delegated to Congress by Art. I, § 8.

*Id.* at 102–03, 88 S.Ct. at 1954.

The plaintiffs here do not challenge an expenditure for which authority is found only in article I, section 8, clause 1. The repeal of the 1867 prohibition against maintaining a mission in Rome is not a spending enactment. And the general appropriation bill that authorizes support for foreign missions is a law "necessary and proper for carrying into Execution ... Powers vested by this Constitution in the Government of the United States." U.S. Const., art. I, § 8, cl. 18. The power in question—the conduct of foreign affairs—is not only vested in the Government of the United States, but is vested exclusively so. *Id.*, art. I, § 10, cl. 1. The Court in *Flast*, by carefully limiting taxpayer standing to challenges of expenditures solely dependent upon the·taxing and spending clause, made clear that one's status as a taxpayer did not confer upon one standing to challenge the exercise of other governmental powers, as this court has so held. *See Americans United for Separation of Church and State v. Department of Health, Education & Welfare*, 619 F.2d 252, 260 (3d Cir.1980), *rev'd on other*

*grounds, Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

The Supreme Court has recently reaffirmed the continued vitality of the basic *Frothingham* rule with respect to taxpayer standing. *See Valley Forge,* 454 U.S. at 477, 102 S.Ct. at 761. Indeed the Court stated that *Flast* did not even reach Executive Branch actions. *See id.* at 479, 102 S.Ct. at 762. Thus we hold that, to the extent plaintiffs rely on their taxpayer status, they lack a sufficient protectable interest to permit them to litigate the question of expenditures for the support of a diplomatic mission to the Vatican. Their challenge to the diplomatic recognition itself, distinct from the challenge to funding of the mission, is even more remote from their status as taxpayers.

### 2. Citizen Standing

■ The allegations in the plaintiffs' complaint that addressed particularized injury do not suggest that the injuries complained of invade any specific right conferred on them by virtue of their citizenship. Aside from the right to vote and to hold certain public offices, there are very few rights of citizenship as such. The Supreme Court has consistently rejected claims of citizen standing predicated upon the right, possessed by every citizen, to require that the government be administered in accordance with the Constitution. *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984); *Valley Forge,* 454 U.S. at 482–83, 102 S.Ct. at 764; *Schlessinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216–17, 94 S.Ct. 2925, 2929–30, 41 L.Ed.2d 706 (1974); *Laird v. Tatum,* 408 U.S. 1, 11–14, 92 S.Ct. 2318, 2324–26, 33 L.Ed.2d 154 (1972); *Baker v. Carr,* 369 U.S. 186, 208, 82 S.Ct. 691, 705, 7 L.Ed.2d 663 (1962); *Ex Parte Levitt,* 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937) (per curiam); *Fairchild v. Hughes,* 258 U.S. 126, 129–30, 42 S.Ct. 274, 275, 66 L.Ed.2d 499 (1922). Thus we hold that, to the extent plaintiffs rely on their status as citizens, they lack a sufficient protectable interest to permit them to litigate the issue either of the expenditure of funds or of diplomatic recognition.

### 3. Standing as Victims of Stigmatization

■ Finally, the plaintiffs seek to establish particularized injury different from that they alleged to have suffered as taxpayers and citizens. Their allegations may fairly be characterized as ones of adverse stigmatization that result from (1) their being deprived of the benefits of diplomatic recognition enjoyed by the Vatican and thus the Roman Catholic Church; and (2) their being cast in an adverse light because they cannot enjoy those benefits. One legal shortcoming with the alleged injuries, however, is the absence of any causal connection between them and the challenged governmental action.

The plaintiffs allege, for example, that diplomatic recognition will afford to one church a form of access to the Executive Branch superior to that which is available to other religious organizations for influencing the conduct of the Executive Branch at home or abroad. Yet, the plaintiffs offer no explanation as to why a communication to the Executive Branch through a diplomat would be any more effective than would be a letter from the plaintiffs or a luncheon meeting between the President and a prominent cleric. They allege that diplomatic recognition will result in the President having undue influence in the internal affairs of the Roman Catholic Church, yet they offer no explanation as to why a diplomatic communication from the President would be any more intrusive than would be a communication through a personal representative or a phone call to an archbishop. They allege that the existence of diplomatic relations will subject them to pressure to conform to government policies of which the Roman Catholic Church approves, yet they offer no explanation as to why the delivery of a statement of church position through a diplomat would be any more influential upon the plaintiffs' conduct than would be the publication of the same statement in the national press.

Plaintiffs attempt to sidestep the formidable bar to citizen standing presented by *Valley Forge.* They claim standing as religious adherents and organizations and argue that such status differentiates them from citizens presenting generalized grievances because differential treatment between churches by the government is itself a direct constitutional injury. While the plaintiffs' argument here has some initial appeal, we believe that the status of a religious adherent is insufficiently distinguishable from the type of citizen standing claimed in *Valley Forge* to allow standing in this case.

It may be true, as plaintiffs allege, that as a result of opening diplomatic relations with the Vatican the Vatican's diplomatic representatives will enjoy the benefit of certain federal statutes and of the Treaty of Vienna. And it is true that plaintiffs' church representatives do not enjoy the same benefits. However, the benefits that may be available to the Vatican's representatives are available only because, unlike the plaintiffs' church organizations, the Vatican exercises territorial sovereignty over a small geographical area. It is this fact that accounts for the disparity of treatment of which the plaintiffs complain. The existence of such sovereignty arguably may place the Roman Catholic Church in a more favorable light in the religious market, although such a suggestion seems extremely speculative. But if it does, the complaint leaves one entirely in the dark as to how diplomatic recognition of the conceded territorial sovereignty widens the gap in that marketplace.

The Supreme Court has recognized that noneconomic injuries such as stigmatization can be a basis for demanding legal redress. *E.g. Heckler v. Mathews,* 465 U.S. 728, 104 S.Ct. 1387, 1395–96, 79 L.Ed.2d 646 (1984). The Court has cautioned, however, that the assertion of stigmatizing injuries having only remote or speculative relationships to the governmental activities complained of may not be used to circumvent the rules governing nonjusticiability of generalized grievances by taxpayers or citizens. As Justice O'Connor wrote in *Allen,* "Our cases make clear ... that such [stigmatizing] injury accords a basis for standing only to 'those persons who are personally denied equal treatment by the challenged discriminatory conduct....'" 104 S.Ct. at 3327 (quoting *Heckler,* 104 S.Ct. at 1387). Moreover the stigmatization must be one that is likely to be relieved by a favorable decision. *Allen,* 104 S.Ct. at 3315; *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758; *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976).

Applying the teaching of these cases, we hold that the "direct and palpable injuries" alleged by the plaintiffs are legally insufficient to establish standing to challenge the funding and diplomatic-recognition actions of which they complain.

### B. Justiciability

Assuming, arguendo, that some plaintiff has standing to contest the actions complained of, there remains the hurdle of justiciability. The complaint can only be read as a request for judicial review of the President's decision to extend diplomatic relations to the Vatican. Such review presents two questions: (1) Is the Vatican a territorial sovereignty sufficiently independent of other such sovereign entities as to be entitled to recognition?, and (2) Is the regime claiming to be its government entitled to recognition as such?

It has long been settled that the President's resolution of such questions constitutes a judicially unreviewable political decision. *See National City Bank v. Republic of China,* 348 U.S. 356, 358, 75 S.Ct. 423, 425, 99 L.Ed. 389 (1955); *United States v. Pink,* 315 U.S. 203, 229, 62 S.Ct. 552, 565, 86 L.Ed. 796 (1942); *Guaranty Trust Co. v. United States,* 304 U.S. 126, 137, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938). That the cases referred to remain authoritative is confirmed by language in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the case most frequently cited in discussions of the nonjusticiability of certain issues. In *Baker* Justice

Brennan noted, "Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate branch of government...." *Id.* at 217, 82 S.Ct. at 710. *See also Powell v. McCormack*, 395 U.S. 486, 521 n. 43, 89 S.Ct. 1944, 1964 n. 43, 23 L.Ed.2d 491 (1969). There is such a textually demonstrable commitment with respect to recognition of foreign states. Only the President has the power to "receive Ambassadors and other public Ministers." U.S. Const., art. II, § 3. Only the President has the power to appoint ambassadors, other public ministers, and consuls, although those appointments require the advice and consent of the Senate. *Id.*, art. II, § 2, cl. 2. Diplomatic relations are established by receiving and sending ambassadors or other public ministers. The decision of the Constitutional Convention to confer this power on the President alone carried forward the preexisting practice that only the King, not Parliament "ha[d] the sole power of sending ambassadors to foreign states, and receiving ambassadors at home." 1 W. Blackstone, Commentaries * 253.

Legal challenges to the establishment of diplomatic relations require the review of one of the rare governmental decisions that the Constitution commits exclusively to the Executive Branch. Thus, even assuming that some plaintiff could satisfy the standing required to go forward with this action, a federal court could not grant the plaintiffs the relief they seek.

### Conclusion

The district court did not err in dismissing the complaint. The judgment appealed from will therefore be affirmed.