# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-1130

FREEDOM FROM RELIGION FOUNDATION, INC., *et al.*,

*Plaintiffs-Appellants*,

v.

ELAINE L. CHAO, Secretary of Department of Labor, *et al.*,

*Defendants-Appellees*.

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 C 0381 S—**John C. Shabaz**, *Judge*.

———————

ARGUED SEPTEMBER 13, 2005—DECIDED JANUARY 13, 2006

———————

Before POSNER, RIPPLE, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The question presented by this appeal is whether a taxpayer can ever have standing under Article III of the Constitution to litigate an alleged violation of the First Amendment's establishment clause unless Congress has earmarked money for the program or activity that is challenged. The district judge thought not, and would have been correct in his thinking under an earlier view of Article III's limitation of the federal judicial power to deciding "Cases" and "Controversies." It was once thought that these terms (which "are, for all intents and

purposes, synonymous," *Jones v. Griffith*, 870 F.2d 1363, 1366 (7th Cir. 1989)) limited federal jurisdiction to cases in which the plaintiff alleged the kind of injury that would have supported a lawsuit in the eighteenth century. In the words of Justice Frankfurter, "Both by what they said and by what they implied, the framers of the Judiciary Article gave merely the outlines of what were to them the familiar operations of the English judicial system and its manifestations on this side of the ocean before the Union. Judicial power could come into play only in matters that were the traditional concern of the courts at Westminster and only if they arose in ways that to the expert feel of lawyers constituted 'Cases' or 'Controversies.' . . . Even as to the kinds of questions which were the staple of judicial business, it was not for courts to pass upon them as abstract, intellectual problems but only if a concrete, living contest between adversaries called for the arbitrament of law." *Coleman v. Miller*, 307 U.S. 433, 460 (1939) (concurring opinion).

In line with Justice Frankfurter's thinking, *Doremus v. Board of Education*, 342 U.S. 429, 433-34 (1952), rejected taxpayer standing as inconsistent with Article III, cf. *Frothingham v. Mellon*, 262 U.S. 447, 488 (1923), though a taxpayer could sue in state court to enforce his federal right if the state didn't impose as rigorous a standing requirement as Article III does. See, e.g., *Appleton v. Menasha*, 419 N.W.2d 249, 252-53 (Wis. 1988). The tangible harm to the taxpayer complaining of the expenditure was too attenuated to satisfy eighteenth-century notions of standing embodied in Article III. Indeed, the tangible harm would often be zero because if the complained-of expenditure was enjoined, the money would probably be used to defray some other public expense that would not benefit the taxpayer, rather than returned to him in the form of a lower tax rate.

Notions of standing have changed in ways to induce apoplexy in an eighteenth-century lawyer. For example, *Department of Commerce v. U.S. House of Representatives,* 525 U.S. 316, 331 (1999), upheld standing to challenge the use of statistical sampling for the decennial census; the mere "threat of vote dilution" as a result of the methodology was deemed sufficiently concrete, actual, and imminent to confer standing. *Federal Election Commission v. Akins,* 524 U.S. 11, 20-25 (1998), upheld standing to sue for lists of donors to political action committees, on the ground "that the information would help [the committees] (and others to whom they would communicate it) to evaluate candidates for public office." *Bush v. Vera,* 517 U.S. 952, 958 (1996) (plurality opinion), upheld the standing of voters who lived in newly created majority-minority congressional districts to challenge them as racially gerrymandered on the ground that such districting denied them equal treatment. *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779 (1995), assumed (without discussion) that there was taxpayer and voter standing to challenge a state constitutional amendment that provided that no candidate could be on the ballot who had already served either three terms in the House of Representatives or two terms in the Senate.

And with specific reference to the establishment clause, consider our decision in *American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265, 267-69 (7th Cir. 1986), where we considered how much (or rather how little) injury is required to establish conventional (not even taxpayer) standing in an establishment case. We thought it enough that the plaintiffs, who objected to the prominent display of a cross on public property at Christmas time, had "been led to alter their behavior—to detour, at some inconvenience to themselves, around the streets they ordinarily use," in order to avoid having to see the cross. *Id.* at 268. "The curtailment of

their use of public rights of way" was injury enough to support their suit. *Id.* In reaching this conclusion we relied on *Abington School District v. Schempp,* 374 U.S. 203 (1963), where the Supreme Court had held that schoolchildren and their parents had standing to complain that the reading of the Bible and the recitation of the Lord's Prayer in the public school that the children attended violated the establishment clause. The specific injury to the plaintiffs could have been averted by the parents' taking their children out of the public school and putting them in a secular private school (or by moving to another public school district), but those options did not deprive the plaintiffs of standing because it was an injury to them to take their children out of the public school, just as it was an injury to the plaintiffs in the *St. Charles* case that they had to detour to avoid the direct effect on them of the alleged violation (in effect, to mitigate their damages). No such ground of standing is claimed here, however; it is taxpayer standing or nothing for these plaintiffs.

It was not long after *Schempp* that the Supreme Court decided *Flast v. Cohen,* 392 U.S. 83 (1968), in favor of a taxpayer challenge in federal court to an alleged violation of the establishment clause. Congress had appropriated money for grants of financial assistance to private as well as public schools, and the plaintiffs complained that insofar as some of the grants had been made to parochial schools, the statute violated the establishment clause. The Court interpreted *Frothingham* and *Doremus* as having rested not on Article III—not on the notion that the injury that a taxpayer sustains if his taxes are used for a purpose offensive to him is too slight (in the Frankfurterian originalist conception) to sustain a case or controversy in the Article III sense—but rather on what have come to be called the "prudential" principles of standing. These are judge-made principles

illustrated by *Warth v. Seldin*, 422 U.S. 490, 509 (1975), that deny standing to someone who has been injured as a result of the defendant's conduct (the core standing requirement of Article III) but who is not the "right" person to bring suit, maybe because someone has been injured more and should be allowed to control the litigation.

An example of the prudential limitations on standing is the judge-made "indirect purchaser" doctrine of antitrust law that denies a right of action to a purchaser from a purchaser from a cartel. *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). If as is highly likely a purchaser from the cartel (the "direct purchaser") passes on a portion of the cartel overcharge to his customers (the "indirect purchasers" from the cartel), the latter are injured and an award of damages would redress their injury. So there would be Article III standing. But to allow them to sue would greatly complicate litigation, first because the court would have to determine how much of the overcharge had been passed on, a difficult question of incidence analysis, and second because there would be tiers of plaintiffs complaining about the same violation of law.

But the prudential principles of standing, like other common law principles, are protean and mutable (the term "prudential" is the very antithesis of a definite rule or standard). The Court decided in *Flast* that they should not stand in the way of challenges to "exercises of congressional power under the taxing and spending clauses of Art. I, § 8, of the Constitution," provided that the expenditure complained of is not just "an incidental expenditure of tax funds in the administration of an essentially regulatory statute" and that "the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers dele-

gated to Congress by Art. I, § 8." 392 U.S. at 102-03. The Court found that this two-part test was satisfied by a challenge to the use of "the taxing and spending power . . . to favor one religion over another or to support religion in general." *Id.* at 103.

The word "specific" in the passage we quoted from *Flast* turned out to be critical to the Court's later reasoning. By forbidding Congress to establish a national church, the establishment clause places a specific limitation on congressional appropriations, since the essence of an establishment of religion is government financial support. *Walz v. Tax Commission of City of New York*, 397 U.S. 664, 668 (1970) ("for the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity"); see also *Engel v. Vitale*, 370 U.S. 421, 430-31 (1962). In *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982), we learn that a taxpayer has standing to complain *only* about the violation of a limitation on Congress's power under Article I, section 8, of the Constitution to tax and (implicitly) to spend money to finance the exercise of the various powers granted to Congress by Article I. Taxpayers challenged the donation of a disused army hospital by a federal executive agency to a religious institution. The Court denied them standing because the transfer had not been made by Congress or pursuant to an exercise of Congress's taxing and spending powers; it had been made (by the agency) pursuant to Congress's power under Article IV, section 3, to dispose of U.S. property. *Id.* at 479-80.

To complete the edifice, *Bowen v. Kendrick*, 487 U.S. 589, 618-20 (1988), held that taxpayers had standing to challenge

grants by a federal agency to religious institutions pursuant to a statute that authorized grants to public and private institutions for services related to adolescents' sexual problems, even though the grants had not been made by Congress itself. *Kendrick* was a replay of *Flast*, where the complaint had been not about the statute itself, which said nothing about religion (there was such a complaint in *Kendrick* but the part of the Court's opinion dealing with that complaint does not relate to our case), but about the fact that in administering the statute the executive branch had made grants to religious institutions. Consistent with *Flast*, *Kendrick* reads *Valley Forge* as not requiring taxpayers to show that a statute violated the establishment clause; all they had to show was that a statute enacted pursuant to Congress's taxing and spending powers under Article I, section 8 had been necessary for the violation to occur—it did not have to be sufficient. The violation was not completed until the executive branch acted, but the taxpayers still had standing to challenge it.

In *Valley Forge* the executive branch had simply given away surplus property, and while the property had probably been built or acquired with appropriated funds rather than donated to the government, the Court did not treat the transfer as an expenditure of appropriated funds. Similarly, in *In re United States Catholic Conference*, 885 F.2d 1020, 1027-28 (2d Cir. 1989), where standing to challenge the Internal Revenue Service's grant of a tax exemption to the Catholic Church was denied, there was no expenditure of appropriated funds and no challenge to the exercise of Congress's taxing and spending powers. Cf. *Allen v. Wright*, 468 U.S. 737 (1984); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26 (1976); *District of Columbia Common Cause v. District of Columbia*, 858 F.2d 1, 3-4 (D.C. Cir. 1988).

The present case, however, is governed by *Kendrick*. The taxpayers here are complaining about the use of money appropriated by Congress under Article I, section 8, to fund conferences that various executive-branch agencies hold to promote President Bush's "Faith-Based and Community Initiatives." This is a program that the President has created by a series of executive orders. One order established an Office of Faith-Based and Community Initiatives in the White House. Others established Centers for Faith-Based and Community Initiatives in the various federal departments.

The stated goal of the conferences is to promote community organizations whether secular or religious, as explained in the conferences' website (www.dtiassociates. com/FBCI/):

> For years, faith-based and community groups have been assisting people in need. Unfortunately, the Federal government has often not been a willing partner to these groups in the provision of social services. President Bush has worked to change this. Since he took office, thousands of grassroots organizations have received training in the Federal grants process, and hundreds of these groups have successfully competed for Federal funds for the first time. The White House will host a new round of Conferences on Faith-Based and Community Initiatives to continue supporting the work of effective social service programs. The conferences will provide participants with information about the Federal funding process, available funding opportunities, and the requirements that come with the receipt of Federal funds. The conferences will also provide an opportunity to inform State and local officials about equal treatment regulations and other central elements of the Faith-Based and Community Initiative. The

> conferences will be supported by the Departments of Justice, Agriculture, Labor, Health and Human Services, Housing and Urban Development, Education, Commerce, and Veterans Affairs, the Small Business Administration, and the Agency for International Development.

The plaintiffs claim that in fact the conferences are designed to promote religious community organizations over secular ones.

The complaint—all we have to go on at this stage—is wordy, vague, and in places frivolous, as where it insinuates that the President is violating the establishment clause by "tout[ing] the allegedly unique capacity of faith-based organizations to provide effective social services"— as if the President were not entitled to express his opinion about such organizations. But the complaint is not entirely frivolous, for it portrays the conferences organized by the various Centers as propaganda vehicles for religion, and should this be proved one could not dismiss the possibility that the defendants are violating the establishment clause, because it has been interpreted to require that the government be neutral between religion and irreligion as well as between sects. *McCreary County v. American Civil Liberties Union of Kentucky*, 125 S.Ct. 2722, 2733-34 (2005); *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687, 696 (1994); *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 14-17 (1989). Neutrality goes both ways; if the government merely wants to redress discrimination against religious providers of social services, it is not violating the establishment clause. *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 839 (1995); *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984); *Linnemeir v. Board of Trustees of Purdue University*, 260 F.3d 757, 765 (7th Cir. 2001). But these are the issues on the merits; the only

question before us is the plaintiffs' standing to litigate the merits.

At argument the plaintiffs' counsel was unable to identify the appropriations that fund the conferences. The complaint does, however, allege that the conferences are funded by money derived from appropriations, which means from exercises of Congress's spending power rather than from, say, voluntary donations by private citizens. There is no suggestion that these are appropriations earmarked for these conferences, or for any other activities of the various Faith-Based and Community Initiatives programs, or for a statute pursuant to which the programs were created. The money must come from appropriations for the general administrative expenses, over which the President and other executive branch officials have a degree of discretionary power, of the departments that sponsor the conferences. Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809, 2853, 3115-16, 3136, 3150, 3311-12; Department of Homeland Security Appropriations Act, 2005, Pub. L. No. 108-334, 118 Stat. 1298-99.

The difference, then, between this case on the one hand and *Flast* and *Kendrick* on the other is that the expenditures in those cases were pursuant to specific congressional grant programs, while in this case there is no statutory program, just the general "program" of appropriating some money to executive-branch departments without strings attached. The difference cannot be controlling. Suppose the Secretary of Homeland Security, who has unearmarked funds in his budget, decided to build a mosque and pay an Imam a salary to preach in it because the Secretary believed that federal financial assistance to Islam would reduce the likelihood of Islamist terrorism in the United States. No doubt so elaborate, so public, a subvention of religion would give rise to standing to sue on

other grounds, just as in the St. Charles cross case; taxpayer standing in the hypothetical mosque case would not be essential to enabling a suit to be brought in federal court to challenge the violation of the establishment clause. But it would be too much of a paradox to recognize taxpayer standing only in cases in which the violation of the establishment clause was so slight or furtive that no other basis of standing could be found, and to deny it in the more serious cases.

At the other extreme, the fact that almost all executive branch activity is funded by appropriations does not confer standing to challenge violations of the establishment clause that do not involve expenditures. Imagine a suit complaining that the President was violating the clause by including favorable references to religion in his State of the Union address. The objection to his action would not be to any expenditure of funds for a religious purpose; and though an accountant could doubtless estimate the cost to the government of the preparations, security arrangements, etc., involved in a State of the Union address, that cost would be no greater merely because the President had mentioned Moses rather than John Stuart Mill. In other words, the marginal or incremental cost to the taxpaying public of the alleged violation of the establishment clause would be zero. But in the hypothetical case of the mosque, and in the real though much less dramatic case before us, the objection is to a program for which money undoubtedly is "appropriated," albeit by executive officials from discretionary funds handed them by Congress, rather than by Congress directly.

The government asks us to shift the line so that it runs not between the Presidential (or other official) speech and a Presidential initiative (the conferences), but between the speech and the initiative, on the one hand, and grants

made pursuant to the initiative, on the other hand. The conferences are concerned in part with instructing the attendants on how to apply for government grants for their religious organizations; but the challenge that is before us is not to the grants but to the conferences. The line proposed by the government (no standing to challenge the conferences, standing to challenge the grants) would be artificial because there is so much that executive officials could do to promote religion in ways forbidden by the establishment clause (which despite its wording applies to executive as well as congressional action, *American Civil Liberties Union of Illinois v. City of St. Charles, supra*, 794 F.2d at 270) without making outright grants to religious organizations. For the government to operate a mosque or other place of worship would not involve a grant unless a contractor was involved.

We are mindful that the Court in *Flast* carved an exception for "an incidental expenditure of tax funds in the administration of an essentially regulatory statute." *Flast v. Cohen, supra*, 392 U.S. at 102. We may put to one side "regulatory" and focus on "incidental." That is a relative term. Whether an expenditure is incidental depends on what it is deemed incidental to. Every government expenditure could be thought incidental to the great goal of the public welfare, a pursuit that costs the federal government some $2 trillion a year, to which the cost of a mosque would certainly be incidental. The Department of Homeland Security alone has a budget of more than $30 billion, compared to which the funds required for the construction of a mosque would be small—and therefore "incidental"? The religiously oriented programs challenged in *Kendrick* were incidental to the goal of solving problems of adolescent sexuality, but this did not negate taxpayer standing. If the conferences at issue in this case are, as the plaintiffs charge, intended to promote

religion, the fact that their cost is slight relative to the budgets of the various departments that sponsor them does not make that cost incidental. Otherwise, indeed, there would be no federal taxpayer standing in any case.

The word "incidental" in *Flast* should be reserved for such cases as that of the government's expenditure on an armored limousine to transport the President to the Capitol to deliver the State of the Union address in which he speaks favorably of religion. Or to the government's expenditure on processing the Catholic Church's application in *In re United States Catholic Conference*, *supra*, for a tax exemption. So while it is true that the executive branch would quickly grind to a halt without general budget appropriations from Congress, our analysis, tracking *Kendrick*, would not permit an individual citizen to challenge just any action of the executive with which he disagrees as a violation of the establishment clause.

The hypothetical case of standing to challenge a Presidential speech extolling religion turns out not to be entirely hypothetical. One of the defendants in this case is a former Secretary of Education, Rod Paige, whom the plaintiffs accuse not of sponsoring or administering conferences under the President's Faith-Based and Community Initiatives program but of having given a speech at one of them in which he said that "President Bush does this because he knows first-hand the power of faith to change lives—from the inside out. And the reason he knows this is because faith changed his life." The district judge was right to rule that the plaintiffs had no standing to sue Paige because of that remark, just as he was right to rule, in a part of the case not before us, that the plaintiffs do have standing to challenge actual grants made to faith-based organizations pursuant to the President's initiative. (The judge went on to

dispose of that phase of the case on summary judgment, but the appeal does not challenge his disposition.)

We must consider finally the bearing of a line of cases, illustrated by *United States v. Richardson*, 418 U.S. 166 (1974); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974), and *Public Citizen, Inc. v. Simon*, 539 F.2d 211, 217-19 (D.C. Cir. 1976), in which taxpayer standing to enforce provisions of the Constitution other than the establishment clause was rejected. The *Public Citizen* suit complained that federal employees were illegally assisting in President Nixon's reelection campaign. The court rejected "taxpayer standing to attack any executive action that draws on an outstanding appropriation on the ground that the purchases or services are not in accord with the congressional intent in passing the appropriation. This would place the judiciary in the role of management overseer of the Executive Branch. Such oversight is a function of Congress . . . . When what is involved is expenditures in implementation of a regulatory statute, or mere executive activity that entails some expenditures, there is no . . . arrow aimed at taxpayers as a class, but an activity of concern to the public at large." Federal employees employed in programs of unquestioned constitutionality cannot be sued by taxpayers simply because they divert some of their work time to improper purposes—just as the President could not be sued for a speech extolling religion even in the unlikely event that the speech violated the establishment clause.

So if the plaintiffs acknowledged the underlying constitutionality of the Faith-Based and Community Initiatives program, the fact that government employees involved in the program sometimes wandered out of the neutral zone would not confer standing to sue. But since the program itself is challenged as unconstitutional, the fact that it was

funded out of general rather than earmarked appropriations—that it was an executive rather than a congressional program—does not deprive taxpayers of standing to challenge it. Taxpayers have standing to challenge an executive-branch program, alleged to promote religion, that is financed by a congressional appropriation, even if the program was created entirely within the executive branch, as by Presidential executive order. We therefore vacate the judgment and remand the case for a determination of the merits of those claims that we have determined the plaintiffs have standing to litigate.

VACATED AND REMANDED, WITH DIRECTIONS.

RIPPLE, *Circuit Judge*, dissenting.  Today, the panel majority holds that executive conduct alleged to have violated the Establishment Clause may be challenged by federal taxpayers so long as that conduct was financed in some manner by a congressional appropriation. Because I do not believe that the applicable Supreme Court precedent permits such a dramatic expansion of current standing doctrine, I respectfully dissent.

The modern doctrine of constitutional standing was hard-born and has endured a difficult adolescence. It has now reached a stage of maturity, however, where several milestones in its growth have become important and well-established doctrine firmly ingrained in the Nation's jurisprudence. As an intermediate appellate court, we cannot ignore or treat as malleable what the Supreme Court has mandated.

The first of these principles is the Court's insistence that the core factors in the doctrine of standing are not simply prudential matters of judicial restraint but constitutional requirements rooted firmly in the Case and Controversy Clause of the Third Article of the Constitution. "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to show that he personally has suffered actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 472 (1982) (internal quotations and citations omitted); *see also Allen v. Wright*, 468 U.S. 737, 751 (1984). It is the first of these requirements—the need for a concrete injury—that must be the focus of our inquiry in this case. This "irreducible constitutional minimum" has required that the traditional formula for taxpayer standing, articulated by Chief Justice Warren in *Flast v. Cohen*, 392 U.S. 83, 102-03 (1968), be construed with "rigor." *Valley Forge Coll.*, 464 U.S. at 481. That formula requires that the federal taxpayer establish a logical link between his status as a taxpayer and the type of legislative enactment attacked, which for taxpayers can be only an exercise of the congressional power under the Taxing and Spending Clause of Article I, § 8 of the Constitution. It also requires that the taxpayer establish a nexus between his status as a taxpayer and the precise nature of the constitutional infringement alleged. *Flast* at 102. It is undisputed that the question before us requires that we focus on the first of these requirements and ask whether the plaintiffs have, in the allegations of their complaint, set forth with sufficient rigor a nexus between their status as taxpayers and an exercise of the congressional power under the Taxing and Spending Clause.

Before turning to a definitive answer to that question, we should pause for a moment and reflect on why the Supreme Court requires that we examine this assertion of nexus so rigorously. Taxpayer standing "pushes the envelop" on traditional notions of constitutional standing. Ever since *Frothingham v. Mellon*, 262 U.S. 447 (1923), the specter of a citizen bringing a lawsuit in a federal court to rectify an undifferentiated injury has loomed prominently over the development of our standing jurisprudence. Any assertion of taxpayer standing comes close, dangerously close, to becoming such a case. A lawsuit based on such undifferentiated injury—a mere disagreement with the government policy—is hardly the case and controversy within the jurisdiction of the federal courts.

When the Supreme Court has been called upon to examine this first prong of the *Flast* analysis, its decisions so far have been grounded on the fact that the complaint really did not present a grievance linked to the Taxing and Spending Clause, but instead based on another constitutional provision. Therefore, in *United States v. Richardson*, 418 U.S. 166 (1974), the Court rejected the assertion of taxpayer standing over a suit based on the Accounts Clause. Again in *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974), the Court refused taxpayer standing to an individual who asserted a violation of the Incompatibility Clause. In *Valley Forge*, the Court similarly decided that a taxpayer suit that implicated the Property Clause, not the Taxing and Spending Clause, could not be maintained.

In this case, the gravamen of the plaintiffs' complaint is of course based on the Establishment Clause, a specific restriction on Congress' power to spend. But is it based on an exercise of the Taxing and Spending Clause? The plaintiffs ask that we answer that question in the affirmative

because organizing and conducting the meetings in question involved the expenditure of government funds; the Government replies that the only funds involved are those made available to the President for the operation of his executive office. In its view, specific legislative expenditure under the taxing and spending power is simply not at stake. Rather, the object of the plaintiffs' complaint is the decision of the President to use the funds to conduct these meetings.

My colleagues take the view that, if a taxpayer can challenge the expenditure of government funds under a specific appropriation, they ought to be able to question an expenditure under a general appropriation as well. In my view, this approach, while possessing an initial appeal, simply cuts the concept of taxpayer standing loose from its moorings. The Court's post-*Flast* holdings make it clear that taxpayer standing survives as a narrow exception to *Schlesinger*, *Richardson* and *Wright*'s ban on generalized grievances. It has survived, even on those narrow terms, only because of the inherent difficulty in enforcing the specific prohibition of the Establishment Clause against the expenditure of government funds for the establishment of religion. *See Flast*, 392 U.S. at 103. Beneficiaries of such spending have no incentive to sue, and non-beneficiary outsiders cannot show a direct injury. *Flast* allows standing in these cases so that tax- and expenditure-based violations of the Establishment Clause do not go unremedied. The Supreme Court has made the judgment that the values embodied in the Case and Controversy Clause— separation of powers and the adversary process[1]—are sufficiently

---

[1] *See Flast v. Cohen*, 392 U.S. 83, 94-95 (1968) ("Embodied in the words 'cases' and 'controversies' are two complementary but somewhat different limitations. In part those words limit
(continued...)

protected when a taxpayer makes a specific objection linked to a specific exercise of the taxing and spending power on the ground that it violates the Establishment Clause.

Indeed, a good illustration of *Flast*'s limited purpose is the part of this case, no longer part of this appeal, in which Freedom from Religion challenged specific grants that it alleged were distributed preferentially to religious organizations under the government's faith-based programs. One of these grant programs was "Mentoring Children of Prisoners," established by Congress in the Promoting Safe and Stable Families Amendments of 2001, Pub. L. No. 107-133, 115 Stat. 2414 (2002). The program's purpose was to provide support for children with incarcerated parents, and it expressly made eligible for funding faith- and community-based organizations. An organization called MentorKids USA applied for and received a grant under the congressional program. With its stated mission to "exalt the Lord Jesus Christ as the Son of God," MentorKids hired only Christians as mentors, and required its mentors to give monthly reports on the progression of their mentee's "relationship with God." R.53 at 9-10. On the allegation that Congress had made public funds available to MentorKids, the district court, quite properly, allowed taxpayer standing to challenge the grant.

Without the *Flast* exception, it is unlikely that anyone would have had standing to sue in such a situation. Cer-

---

[1] (...continued)
the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process. And in part those words define the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government.")

tainly, MentorKids was not going to challenge the grant it received. Similarly, non-sectarian community groups who applied for, but were denied a grant under the same program, would not have been able to satisfy the injury-in-fact and redressibility requirements of conventional standing doctrine; their injury would have been indirect and their allegations that they would have received funding but for the preferential treatment of religious groups would have been too speculative.[2] Finally, an individual plaintiff who came into direct contact with MentorKids and was offended by the group's religious message could not sue for violation of the Establishment Clause because MentorKids is not a state actor. *Flast*, therefore, remains necessary to allow challenges to situations in which Congress makes no public endorsement of religion but nevertheless supports a sectarian cause through the transfer of public funds. *See Flast*, 392 U.S. at 103 ("Our history vividly illustrates that one of the specific evils feared by those who drafted the Establishment Clause and fought for its adoption was that the taxing and spending power would be used to favor one religion over another or to support religion in general."); *see also, e.g.*, *Pulido v. Bennett*, 860 F.2d 296, 297 (8th Cir. 1988) (allowing

---

[2] *Cf. Allen v. Wright*, 468 U.S. 737, 757 (1984) (holding that parents lacked standing to challenge tax-exempt status of discriminatory private schools because it was too "speculative . . . whether withdrawal of a tax exemption from any particular school would lead the school to change its policies"); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 42 (1976) (denying standing to challenge the tax-exempt status of hospitals who refused care to indigents because the injury to plaintiffs was highly indirect and "result[ed] from the independent action of some third party not before the court"). Likewise, as the Court pointed out in *Warth v. Seldin*, "the indirectness of the injury . . . may make it substantially more difficult to meet the minimum requirement of Art. III." 422 U.S. 490, 505 (1975).

taxpayer standing to bring an establishment clause challenge against a spending program that channeled funding to parochial schools).

Because the *Flast* exception serves such a narrow purpose, its application has been confined to its express terms. After *Schlesinger*, *Richardson* and *Valley Forge*, to earn taxpayer standing a plaintiff must bring an attack against a disbursement of public funds made in the exercise of *Congress'* taxing and spending power; focus on a program originating in the executive branch will not suffice. *See Valley Forge*, 454 U.S. at 479 ("*Flast* limited taxpayer standing to challenges directed only at exercises of congressional power") (internal quotation marks and alterations omitted); *Schlesinger*, 418 U.S. at 228 (denying standing because the taxpayer plaintiffs "did not challenge an enactment under Art. I, § 8, but rather the action of the Executive Branch").

*Bowen v. Kendrick*, 487 U.S. 589 (1988), did not alter the strictures on taxpayer standing. In *Bowen*, the Court upheld taxpayer standing to lodge an Establishment Clause challenge against the Adolescent Family Life Act ("AFLA"), a congressional spending program whose administration was delegated to the Secretary of Health and Human Services. Rejecting the Secretary's argument that funds were distributed by an executive branch agency rather than by Congress, the Court observed that "[t]he AFLA is at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers, and appellees' claims call into question how the funds authorized by Congress are being disbursed pursuant to the AFLA's statutory mandate." *Id.* at 619-20. That executive officials had been delegated the actual authority to write the checks did not matter. *Id.* at 619 ("We do not think . . . that appellees' claim that AFLA funds are being used improperly by individual grantees is any less a challenge to congressional taxing and spending power

simply because the funding authorized by Congress has flowed through and been administered by the Secretary."). The touchstone of the *Flast* inquiry, according to *Bowen*, was whether the Secretary had been "given authority under the challenged statute to administer the spending program that *Congress had created.*" *Id.* (emphasis added).

I cannot accept my colleagues' contention that *Bowen* broadens taxpayer standing so that it is sufficient for plaintiffs to show merely that a congressional appropriations statute enabled the executive branch to violate the Establishment Clause. Such a standard makes virtually any executive action subject to taxpayer suit. The executive can do nothing without general budget appropriations from Congress and the approach of my colleagues will permit an individual citizen to challenge any action of the executive with which he disagrees, as violative of the Establishment Clause. *Bowen* simply did not sanction such a judicial intrusion into the affairs of the executive at the request of an individual who can assert no specific connection between his status as a taxpayer and the executive decision. *See Bowen*, 487 U.S. at 620 ("In this litigation there is still a sufficient nexus between the taxpayer's standing as taxpayer and the congressional exercise of taxing and spending power . . . ."). In short, my colleagues expand the narrow concept of taxpayer standing to the point where it cannot be distinguished from the citizen standing that the Supreme Court has regarded, throughout the development of the modern standing doctrine, as destructive of the case and controversy limitation on the power of the federal courts to intrude into the decision-making prerogatives of the executive branch.

The majority's position sets this circuit on a course different from that of the other courts to have applied the *Flast* exception after *Bowen.* The Court of Appeals for the

District of Columbia Circuit, when asked by municipal taxpayers to prohibit the District of Columbia from expending public funds to oppose citizens' initiatives, observed that the "[Supreme] Court has never recognized federal taxpayer standing outside [of *Flast*'s] narrow facts, and it has refused to extend Flast to exercises of executive power." *District of Columbia Common Cause v. District of Columbia*, 858 F.2d 1, 3-4 (D.C. Cir. 1988) (citations omitted). Similarly, in *In re United States Catholic Conference*, 885 F.2d 1020 (2d Cir. 1989), the Court of Appeals for the Second Circuit denied taxpayer standing to pro-choice supporters who alleged that the IRS, by granting tax-exempt status to the Catholic church, had violated the Establishment Clause. The court reasoned:

> Plaintiffs in the instant case do not challenge Congress' exercise of its taxing and spending power as embodied in § 501(c)(3) of the [Tax] Code; they do not contend that the Code favors the Church. . . . Instead, they argue that the IRS, in allegedly closing its eyes to violations by the Church, is disregarding the Code's mandate and the Constitution. The complaint centers on an alleged decision made solely by the executive branch that in plaintiffs' view directly contravenes Congress' aim. The instant case is therefore distinguishable from [*Bowen v. Kendrick*]. In that case, there was "a sufficient nexus between the taxpayer's standing as a taxpayer and the congressional exercise of taxing and spending power, notwithstanding the role the Secretary plays in administering the statute." *Kendrick*, 108 S. Ct. at 2580. Here, there is no nexus between plaintiffs' allegations and Congress' exercise of its taxing and spending power. Hence, *Kendrick* does not alter the requirements of taxpayer standing to allow the instant plaintiffs to challenge how the IRS administers the Code.

*Id.* at 1028. In short, the Second Circuit squarely held that the alleged *executive branch misapplication* of a statutory tax exemption enacted by Congress under its Taxing and Spending Power is, under prevailing Supreme Court precedent, insufficient to support taxpayer standing. Like an arguably illegal executive expenditure (like the one alleged in this case), the misapplication of a tax exemption impacts the congressional policy decision embodied in the statute. It is not, however, an attack on Congress' exercise of the Taxing and Spending Power.

As these cases demonstrate, our sister circuits have refused to interpret *Bowen* as affording taxpayer standing based simply upon a showing that a statute enabled the executive branch to violate the Establishment Clause. This circuit ought to follow the same course and, in the process, adhere to the principles set forth in the Supreme Court's case law. Accordingly, I respectfully dissent.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*