In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 05-4604 & 05-4781

ANTHONY HINRICHS, HENRY GERNER,
LYNETTE HEROLD, et al.,

*Plaintiffs-Appellees,*

*v.*

BRIAN BOSMA, in his official capacity
as Speaker of the House of Representatives
of the Indiana General Assembly,

*Defendant-Appellant.*

_____

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 05 C 813—**David F. Hamilton,** *Judge.*

_____

MOTION FOR STAY

_____

MARCH 1, 2006[Œ]

_____

Before RIPPLE, KANNE and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* This matter is before the court on the motion of the appellant for a stay pending his appeal to this

_____

[Œ] This opinion was released initially in typescript form.

court. The underlying action was brought by four Indiana taxpayers against the Speaker of the Indiana House of Representatives. In their complaint, they contended that the House's practice of opening its proceedings with overtly sectarian prayer, usually Christian, violates the Establishment Clause of the First Amendment. After a bench trial, the district court issued a declaratory judgment that Indiana's practice is unconstitutional and permanently enjoined the Speaker from permitting further sectarian prayer at the beginning of House meetings. The House Speaker, the Honorable Brian Bosma, then sought a stay of the district court's judgment during an appeal to this court. The district court denied the motion.

The Speaker, having filed an appeal from the underlying judgment, now seeks a stay of the judgment in this court. The plaintiffs have responded to the motion for a stay, and the Speaker has filed a reply memorandum. The matter is therefore ready for resolution. For the reasons set forth in this opinion, we deny the stay. Because this matter involves the internal proceedings of a state legislative body and therefore raises important federalism concerns, we have departed from our usual practice of deciding preliminary matters such as this one by a short order and have elected to set forth our views in more plenary fashion. We hope that, by proceeding in this manner, the tentative nature of our analysis at this very early point in the litigation will be plain to all.

# I

## BACKGROUND

The facts in this case are not disputed. For 188 years, the Indiana House has opened its official meetings with a

brief prayer or invocation, usually delivered by a cleric from an Indiana community who is sponsored by a state representative. Each guest cleric receives confirmation by mail of his temporary appointment; notably, the form letter states, "[w]e ask that you strive for an ecumenical prayer as our members, staff, and constituents come from different faith backgrounds." *Hinrichs v. Bosma*, 400 F. Supp. 2d 1103, 1105 (S.D. Ind. 2005). Clerics otherwise receive no instructions about the form their prayers should take. The Speaker does not participate in the selection of guest clerics, and he usually meets them for the first time immediately before introducing them at the opening of a House meeting.

During the 2005 session of Indiana's General Assembly, 53 invocations were delivered in the House: 41 by Christian clerics, 9 by representatives and one each by a layman, a rabbi and an imam. Of the 45 invocations for which transcripts are available, 29 were identifiably Christian. (The rabbi's prayer was not transcribed, but the imam's was a nonsectarian prayer.) Exhibit one to the plaintiffs' response to the stay motion helpfully catalogues the prayers; the majority of the Christian prayers are identifiable by supplications to Christ: They are given "in Christ's name," "through [Y]our Son Jesus Christ," "In the Strong name of Jesus our Savior," etc. Appellees' Mem. in Opposition to Stay, Ex.1 at 1-5. Several go further, including one that "look[s] forward to the day when all nations and all people of the earth will have the opportunity to hear and respond to messages of love of the Almighty God who has revealed Himself in the saving power of Jesus Christ." *Id*. at 12. The most dramatic example was a prayer followed by a rousing sing-along, led by that day's cleric, of the tune, "Just a Little Talk with Jesus." *Id*. at 14. Some legislators and members of the public stood and clapped in time as they sang; several

legislators, however, left the House chamber, believing that the song was inappropriate. *See Hinrichs*, 400 F. Supp. 2d at 1107.

The district court, in analyzing the record made by the parties, wrote a thorough 60-page opinion. After a comprehensive overview of the facts, the district court determined that the plaintiffs had standing to bring this action. The court held that the plaintiffs had succeeded in demonstrating the use of tax dollars with respect to the sectarian invocations: Several hundred dollars support the invocations through mailings to the guest clerics and through webstreaming (online presentation) of each meeting, including the invocation portion. The district court declined to accept the Speaker's argument that, in order to have taxpayer standing, the plaintiffs must show that the elimination of the challenged practice will result in a reduction in their tax payments. On the merits, the district court held that *Marsh v. Chambers*, 463 U.S. 783 (1983), provided the controlling precedent, and that *Marsh* allows ecumenical, nondenominational legislative prayer, but forbids such prayer when it is overtly and consistently sectarian. The court also declined to accept the Speaker's contention that courts may not decide which prayers are Christian in nature and which are ecumenical. In the district court's view, *Marsh* rejected that proposition. In like manner, the district court did not accept the argument that prohibiting sectarian prayer would violate the Free Exercise or Free Speech rights of guest clerics.

## II

## DISCUSSION

In reviewing a motion for a stay pending appeal, we review the district court's findings of fact for clear error, its balancing of the factors under the abuse of discretion standard and its legal conclusions de novo. In assessing whether a stay is warranted, the district court was required to determine whether the party seeking the stay has demonstrated that: 1) it has a reasonable likelihood of success on the merits; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if it is denied; 4) the irreparable harm the party will suffer without relief is greater than the harm the opposing party will suffer if the stay is granted; and 5) the stay will be in the public interest. *See Kiel v. City of Kenosha*, 236 F.3d 814, 815-16 (7th Cir. 2000). A party seeking a stay pending appeal has a similar burden: It must show that it has a significant probability of success on the merits; that it will face irreparable harm absent a stay; and that a stay will not injure the opposing party and will be in the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

### A. Likelihood of Success on the Merits

#### 1. Standing

The Speaker first contends that he will prevail on the merits of the appeal because the plaintiffs are without standing to sue. Both parties accept that, in order to have standing as a taxpayer, a person must demonstrate that the challenged program is supported by monies raised through taxes and that the use of those monies exceeds a specific constitutional limitation on the use of public funds, such as the First Amendment's prohibition on laws re-

specting an establishment of religion. *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 481-82 (1982); *Flast v. Cohen*, 392 U.S. 83, 102-03 (1968); *Metzl v. Leininger*, 57 F.3d 618, 619 (7th Cir. 1995). This is true even if the amounts in question are piddling. *See United States v. SCRAP*, 412 U.S. 669, 689 n.14 (1973); *Lynch v. Donnelly*, 465 U.S. 668, 671 (1984) (involving expenditure of $20 per year to erect creche); *American Civil Liberties Union v. City of St. Charles*, 794 F.2d 265, 267-68, 274 (7th Cir. 1986) (noting that *Lynch* assumed standing to challenge a nativity scene that cost only $20 to arrange). On the submissions of the parties at this early stage of the litigation, it appears that this standard has been met. The record shows that tax dollars supported the cost of mailings to guest clerics, at $0.54 to $1.60 each, and the cost of web-streaming the invocation portions of the 2005 sessions, at $1.88 per minute. By the district court's calculations, the total cost in tax dollars of the House's invocational prayers in 2005 was $448.38. *Hinrichs*, 400 F. Supp. 2d at 1111 n.6.

In reply, the Speaker submits that the plaintiffs are without taxpayer standing because the elimination of the challenged program would not inure to the plaintiffs' fiscal benefit. In other words, because the cost of mailings and web-streamings would be the same even if the invocations were nondenominational and therefore permissible, the sectarian prayers have no "marginal cost" to taxpayers. Mr. Bosma attempts to support this theory with dictum from this court's recent decision in *Freedom From Religion Foundation v. Chao*, 433 F.3d 989, 995 (7th Cir. 2005). Although we certainly shall review this matter once again on plenary review, we do not believe that the Speaker's reliance on this dictum permits him to meet his burden of demonstrating probability of success on the merits. In *Freedom From Religion Foundation,* we held that taxpayers had standing to

challenge the President's use of funds for faith-based initiatives even though the funds in question were doled out by the executive branch rather than earmarked by Congress in specific grants. The court then noted, as an aside, that even though all executive branch activity uses appropriated funds, citizens would be without standing to challenge practices "that do not involve expenditures":

> Imagine a suit complaining that the President was violating the [Establishment] [C]lause by including favorable references to religion in his State of the Union address. The objection to his action would not be to any expenditure of funds for a religious purpose; and though an accountant could doubtless estimate the cost to the government of the preparations, security arrange- ments, etc., involved in a State of the Union address, that cost would be no greater merely because the President had mentioned Moses rather than John Stuart Mill. In other words, the marginal or incremental cost to the taxpaying public of the alleged violation of the Establishment Clause would be zero.

*Id.*

Read in context, this passage appears simply to repeat the rule that taxpayers who cannot trace a challenged practice to *any* expenditure are without standing. If we were to accept the Speaker's argument as presented at this stage of the litigation, any time an unconstitutional practice could be replaced at no cost with a constitutional one, those asserting taxpayer standing would be powerless to challenge it. The Speaker has yet to respond persuasively to the district court's criticism that acceptance of such a rule would mean that taxpayers are without standing to challenge the erection of a large stone cross on public land if it theoretically could be replaced with a secular monument of the same price.

Such a theory misapprehends the purpose of taxpayer standing: The true injury is whether the plaintiff's tax dollars are being spent in an illegal manner. Such an injury is redressed not by giving the tax money back, s*ee D.C. Common Cause v. District of Columbia*, 858 F.2d 1, 5 (D.C. Cir. 1988) ("The Supreme Court has never required state or municipal taxpayers to demonstrate that their taxes will be reduced as a result of a favorable judgment."); *cf. Freedom From Religion Foundation*, 433 F.3d at 990 (noting that the tangible harm of most unconstitutional spending practices is zero, because instead of returning the taxes that support the practices, the government spends the money elsewhere), but by ending the unconstitutional spending practice. More to the point, the "marginal cost" statement in *Freedom From Religion Foundation* is dictum in its purest form: It occurs in a discussion of a hypothetical that illustrates a point peripheral to the case at hand. *Id*. It therefore is not binding authority. *Cent. Green Co. v. United States*, 531 U.S. 425, 431 (2001).[1]

---

[1] The other cases cited by the Speaker do not even arguably create a "marginal cost" requirement. Rather, they simply demonstrate that individuals who cannot trace the challenged practice to tax dollars cannot enjoy taxpayer standing. *See Doremus v. Bd. of Educ.*, 342 U.S. 429, 434-35 (1952) (no taxpayer standing to challenge classroom readings of the Bible because no showing that tax dollars fund the practice); *Gonzales v. North Township of Lake County*, 4 F.3d 1412, 1416 (7th Cir. 1993) (no taxpayer standing to challenge crucifix in public park because it was donated); *Friedman v. Sheldon Cmty. Sch. Dist.*, 995 F.2d 802 (8th Cir. 1993) (no taxpayer standing to challenge benediction at high school graduation because no showing that tax funds supported it); *Freedom from Religion Found. v. Zielke*, 845 F.2d 1463,

(continued...)

We therefore must conclude that the Speaker is unable to show a substantial likelihood of success on the merits of his standing argument.

## 2. Establishment Clause

The Supreme Court has addressed the constitutionality of legislative prayer only once. *See Marsh v. Chambers*, 463 U.S. 783, 791-95 (1983). In that case, a state legislator and taxpayer challenged the Nebraska legislature's practice of offering a brief prayer, conducted by a staff chaplain whose salary was paid from tax funds, before the start of official business each day. The Supreme Court upheld the practice. The Court analyzed the issue largely based on considerations of history and tradition. Noting the contemporaneous writing of the First Amendment and the establishment of legislative prayer in Congress, the Supreme Court stated that the Framers would not have established a practice that violated their understanding of the constitutional amendment that they just had composed. The opinion holds that the practice of legislative prayer is "simply a tolerable acknowledgment of beliefs widely held among the people of this country." *Id*. at 792.

After approving the practice in general terms, the Court proceeded to discuss whether particular features of Nebraska's invocations were constitutionally problematic. It noted in a footnote that the prayers were "nonsectarian" and "Judeo Christian," and that, "[a]lthough some of [the chaplain's] earlier prayers were often explicitly Christian,

---

[1] (...continued)
1470 (7th Cir. 1988) (no municipal taxpayer standing to challenge donated Ten Commandments monument).

[he] removed all references to Christ after a 1980 complaint from a Jewish legislator." *Id.* at 793 n.14. In the text of the opinion, the Court concluded: "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id.* at 794-95.

In the case now before us, the plaintiffs contend, and the district court held, that the consistent and pervasive use of Christian invocations in Indiana is the sort of practice that *Marsh* found unacceptable. It is a "prayer opportunity [that] has been exploited to . . . advance . . . one . . . faith or belief." *Id*.

The principal thrust of the Speaker's Establishment Clause claim here turns on whether this passage in *Marsh* should be read as limiting constitutionally acceptable prayer to nonsectarian prayer. In the Speaker's view, this language is dictum, and *Marsh* does not establish a line between permissible nonsectarian legislative prayer and impermissible sectarian legislative prayer. This reading would appear to minimize the Supreme Court's efforts to give guidance on this critical question. Moreover, his position has been rejected by the Supreme Court, as well as many lower federal courts and state courts. Few cases have confronted squarely the constitutionality of sectarian legislative prayer, but, notably, those cases have concluded that *Marsh* prohibits the practice.

Most importantly, the Supreme Court itself has read *Marsh* as precluding sectarian prayer. In *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989), the Supreme Court held unconstitutional the display of a creche in a county courthouse. Justice Kennedy's dissent for four members of the Court maintained that, if legislative prayer

was permissible under *Marsh*, then surely the creche was also constitutional. *Id.* at 665 & n.4 (Kennedy, J., dissenting). Justice Blackmun's majority opinion replied:

> Indeed, in *Marsh* itself, the Court recognized that not even "the unique history" of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief. The legislative prayers involved in *Marsh* did not violate this principle because the particular chaplain had "removed all references to Christ." Thus, *Marsh* plainly does not stand for the sweeping proposition Justice Kennedy apparently would ascribe to it, namely, that all accepted practices 200 years old and their equivalents are constitutional today.

*Id.* at 603 (internal citations omitted); *see also id*. at 604 n.53 (noting that a Governor's preference for Christianity and discrimination against all non-Christians in his Thanksgiving proclamation is the "very evil" against which the Establishment Clause is meant, in part, to protect). Furthermore, Justice O'Connor, in her separate opinion, emphasized that both the longstanding existence of legislative prayer and its "nonsectarian nature" in *Marsh* led her to conclude that the practice did not violate the First Amendment. *Id.* at 630-31 (O'Connor, J., concurring).

The only other Supreme Court case that meaningfully elucidates *Marsh* is *Van Orden v. Perry*, 125 S. Ct. 2854 (2005). In that case, which approved a monument of the Ten Commandments at the Texas capitol, the Court discussed cases that recognized the role of God in American heritage. It cited *Marsh*, and in a footnote suggested that the challenge to Nebraska's legislative prayer may have been rejected because the prayers were nonsectarian: "In *Marsh*, the

prayers were often explicitly Christian, but the chaplain removed all references to Christ the year after the suit was filed." *Id.* at 2862 n.8.

We never have addressed the constitutionality of legislative prayer, but we have read *Marsh* as hinging on the nonsectarian nature of the invocations at issue there. *See Doe v. Vill. of Crestwood*, 917 F.2d 1476, 1479 (7th Cir. 1990) (striking down town's "Touch of Italy" festival that included a Roman Catholic mass and stating that *Marsh* approved a "non-denominational" prayer); *Van Zandt v. Thompson*, 839 F.2d 1215, 1218-19 (7th Cir. 1988) (noting that in *Marsh* the chaplain removed references to Christ and there was no evidence that the prayers were exploited to proselytize or advance one religion); *City of St. Charles*, 794 F.2d at 271 (striking down city's display of a large lighted cross and citing *Marsh* for proposition that "conventional nonsectarian public invocations of the deity" are permissible).

Other circuits, however, have confronted the question of sectarian legislative prayer directly, and their decisions are consistent with the district court's conclusion. Most recently, the Fourth Circuit relied upon *Marsh* to resolve two cases involving legislative prayer. In *Wynne v. Town of Great Falls*, 376 F.3d 292 (4th Cir. 2004), the court struck down a town's practice of opening city council meetings with prayers that closely resembled the majority of prayers in this case: brief offerings that ended with supplications like, "In Christ's name we pray." *Id.* at 294. The court placed great reliance on *Marsh*'s limitation to nonsectarian prayer and its warning that prayer that advances a particular religion is impermissible; it also discussed at some length the Court's subsequent interpretation of *Marsh* in *Allegheny County. See id.* at 297-301. The court concluded that the Christian

prayers at issue violated the rule of these two cases by "affiliat[ing]" the government with the Christian religion. *Id*. at 300. A second case, *Simpson v. Chesterfield County Board of Supervisors*, 404 F.3d 276 (4th Cir. 2005), reaffirms *Wynne*'s reading of *Marsh* and *Allegheny County* and holds that a local board's nonsectarian prayers were permissible under those cases.

The Ninth Circuit faced a similar issue in *Bacus v. Palo Verde Unified School District Board of Education*, 52 Fed. App'x 355 (9th Cir. 2002) (unpublished order).[2] There, the court struck down a school board's practice of sectarian invocations at official meetings, which ended "in the Name of Jesus." *Id*. at 356-57. The court deliberated over whether school board prayer should be analyzed under *Marsh* or under school prayer cases; it ultimately did not have to decide this issue, holding that the practice would even violate the more lenient *Marsh* doctrine. *Id.* at 356. According to that court, the overtly Christian prayers were an inappropriate effort to "advance" Christianity, in *Marsh*'s terms, and showed the government's "allegiance" to that faith, in *Allegheny County*'s. *Id.* at 357.[3]

---

[2] *See* Ninth Cir. R. 36-3(b) (prohibiting citation to unpublished orders *by courts within the Ninth Circuit*).

[3] A similar case in the Sixth Circuit also deserves mention. In *Stein v. Plainwell Community Schools*, 822 F.2d 1406 (6th Cir. 1987), the Sixth Circuit struck down the overtly Christian invocations and benedictions used at two Michigan high school graduation ceremonies. Relying on *Marsh* to find that prayer in such settings may in some cases be permissible—a view that the Supreme Court later rejected in *Lee v. Weisman*, 505 U.S. 577 (1992)—the court held that *Marsh* strictly prohibited the *sectarian*

(continued...)

The Speaker invites our attention to two circuit cases to support his more limited reading of *Marsh* to mean that all legislative prayer is constitutionally permissible. In *Murray v. Buchanan*, 720 F.2d 689 (D.C. Cir. 1983) (en banc) (per curiam), the court dismissed an appeal challenging Congress' policy of opening its meetings with a prayer by a paid chaplain; the appeal was pending at the time *Marsh* was decided. This per curiam opinion simply notes that *Marsh* approved legislative prayer by a paid chaplain, and so the identical challenge regarding Congress' practice did not raise "a substantial constitutional question." *Id.* at 690. Although the Speaker contends that Congress itself uses sectarian prayers, and that *Murray* thus implicitly approved the practice, that opinion does not mention or rely upon the content of the prayers. In addition to the D.C. Circuit in *Murray*, several courts have heard challenges to Congress' practice of legislative prayer. However, none of these cases turns on the *content* of the prayer.[4]

---

[3] (...continued)
prayers at the commencements, or at any other solemnizing occasions. *Stein*, 822 F.2d at 1408-09; *see id.* at 1410 (Milburn, J., concurring). While the decision's broad holding is thus no longer good law, *Stein* remains valuable for its interpretation of *Marsh*.

[4] One of these cases was resolved on standing grounds, *see Kurtz v. Baker*, 829 F.2d 1133 (D.C. Cir. 1987), and another simply tracks *Murray* to reject a generic challenge to the practice of legislative prayer by a paid chaplain, *see Newdow v. Eagan*, 309 F. Supp. 2d 29, 40-42 (D.D.C. 2004). A related case, *Newdow v. Bush*, 355 F. Supp. 2d 265, 288-90 (D.D.C. 2005), *aff'd* No. 05-5003, 2005 WL 89011 (D.C. Cir. Jan. 16, 2005) (unpublished order), rejects an attempt to enjoin the invocation at the 2005 presidential inauguration, but does not rely on the sectarian nature of the invocation, (continued...)

The Speaker also relies upon *Snyder v. Murray City Corp.*, 159 F.3d 1227 (10th Cir. 1998) (en banc), in which the court upheld a city's refusal to let a particular citizen make an aggressive invocation that derided legislative prayer and Christianity generally. The court held that such an invocation would directly conflict with *Marsh*'s prohibition against prayer that "proselytize[s]" or "disparage[s]" a particular "faith or belief." *Id.* at 1234. The court then offered its view of *Marsh*'s limitations generally, stating that prayer that proselytizes or "aggressively advocates" one religion is prohibited; approved prayer, by contrast, "although often taking the form of invocations that reflect a Judeo-Christian ethic, typically involves nonsectarian requests for wisdom and solemnity, as well as calls for divine blessing on the work of the legislative body." *Id.; see also id*. at n.10. Thus, *Snyder* offers little support for the Speaker's position.

Finally, several state courts have addressed the issue of legislative prayer and are consistent with the district court's decision here. In *Rubin v. City of Burbank*, 124 Cal. Rptr. 2d 867 (Cal. Dist. Ct. App. 2002), a case nearly identical to this one, the court struck down as violating the federal constitution a city council's policy of using rotating clergy who

---

[4] (...continued)
because the content of the prayer was not made known in advance. (The court's discussion of this issue gives the impression of an attempt to avoid the difficult issue of sectarian prayer at the inauguration.) In sum, these cases either do not discuss or rely on the sectarian nature of congressional prayer. Should a court decide a case squarely confronting that issue, such a case would be important authority in deciding the Indiana dispute here, but until that time, the question of congressional prayer is not relevant.

offered, in the majority of cases, overtly Christian prayers. And in *Society of Separationists v. Whitehead*, 870 P.2d 916 (Utah 1993), the court upheld a city council's practice of legislative prayer under the Utah constitution in large part because of the pointedly nonsectarian nature of the invocations. These cases appear to teach the rule that nonsectarian legislative prayer is constitutionally sound, but sectarian appeals, including those of an overtly Christian nature, are not.

In our initial reading of the case law, we find little to encourage the Speaker's reading of the law. It appears that such an approach would render nugatory critical facts and limitations expressed by the Supreme Court in *Marsh*, even though the Court itself and many other lower federal courts have found those points dispositive. In pointing to congressional practices that have been sustained, but without reference to the prayers' contents, he asks that we read into those cases issues that simply were not addressed by the courts.

The Speaker advances several other arguments that require now, and on plenary review, our respectful attention. He suggests that prohibiting clerics from invoking Christ would violate the Free Exercise or Free Speech Clauses of the First Amendment. These issues, while new to this circuit's jurisprudence, have been addressed by other courts and have been rejected. The same fate has met the argument that deciding which prayers are sectarian is an inappropriate role for judges.[5]

---

[5] For the former point, see *Simpson*, 404 F.3d at 288; *Bacus v. Palo Verde Unified Sch. Dist. Bd. Educ.*, 52 Fed. App'x 355, 357 (9th Cir. 2002); *Rubin*, 124 Cal. Rptr. 2d at 1206-07, all of which note

(continued...)

### B. Irreparable Injury and Other Factors

As this case comes to us, the other main consideration in deciding whether to grant a stay is the Speaker's submission that the House of Representatives over which he presides will be harmed irreparably in the absence of one. Mr. Bosma contends that such harm would stem from the fact that Indiana's long tradition of offering invocations would be broken absent a stay because no prayer at all can continue in the face of the district court's injunction. However, as the district court took pains to point out, this harm to the House of Representatives' legislative tradition need not occur under the terms of the injunction. The injunction permits prayer so long as it is of a nondenominational nature and does not "use Christ's name or title or any other denominational appeal." *Hinrichs v. Bosma*, 2006 WL 182601, at * 1 (S.D. Ind. Jan. 24, 2006). Indeed, it appears that the legislative tradition is left intact by the injunction. The House's current practice is to ask clergy to "strive for an ecumenical prayer." It is simply the toleration of the failure to follow this practice that has produced this litigation and required the action of the federal court. In reply to the injunction, the Speaker chose to cut off all prayer and, it would appear, has sacrificed the core aspect of the tradition—beginning the session with an invocation for divine guidance—in order to continue a deviation from the House's articulated desire

---

[5] (...continued)
that individuals have sharply restrained speech and free exercise rights when speaking on behalf of the government, rather than for themselves alone. For the latter point, see *Marsh* itself: Mr. Bosma's position that courts may not determine which prayers are sectarian was Justice Brennan's view in his dissent in *Marsh*. However, the Court found no difficulty in noting that the prayers in that case were ecumenical.

that the prayer not be identified with any particular denomination. The Speaker responds in his reply brief that "a suggestion to be respectful to those present in the legislative setting is not remotely comparable to a binding federal court injunction." Appellant's Reply Mem. at 5 (emphasis omitted). He also suggests in an affidavit that the legislature ought not entangle itself in the process of distinguishing between acceptable nondenominational prayer and non-acceptable denominational prayer. Although this claim certainly is deserving of more plenary and respectful study on the merits review, we cannot say that requiring the legislature to perform a task undertaken by countless other public bodies that begin their proceedings with a prayer is an irreparable harm— especially when the legislature itself has articulated such a goal.

The Speaker relies on two other cases to support his view that courts of appeal should grant stays in sensitive Establishment Clause cases. In *Books v. City of Elkhart*, 239 F.3d 826 (7th Cir. 2001) (Ripple, J., in chambers), this court stayed the mandate pending certiorari after ruling unconstitutional a city's display of a six-foot by three-foot granite monument of the Ten Commandments by itself outside the City Hall. But the removal of the monument—which this court stated in its merits opinion, *Books v. City of Elkhart*, 235 F.3d 292, 307-08 (7th Cir. 2000), would be a difficult, sensitive, and time-consuming task—was a permanent undertaking. Here, by contrast, the legislature must simply tolerate a temporary interruption in permitting a type of prayer that, by its own admission, is not the nondenominational type of prayer that it desires. The Speaker also notes that the Eighth Circuit in *Marsh* stayed the mandate pending certiorari, although there is no opinion explaining its reasoning. But as the district court noted, the entry of a stay under the circumstances here should not be surprising. There was no Supreme Court

authority on the issue of legislative prayer at that time, and the Eighth Circuit's decision in the plaintiffs' favor presumably would have meant firing Nebraska's state-salaried chaplain. No such steps need be taken in this case.

Finally, the Speaker contends that any countervailing harm to the plaintiffs is limited to the minuscule amount of tax dollars at stake here. But this position is flatly contradicted by this court's case law. *See City of St. Charles*, 794 F.2d at 274-75 (noting that plaintiffs' injury includes the harm of the putative Establishment Clause violation). Here the harm to the plaintiffs is no less than a denial of religious liberty in the form of a probable violation of the First Amendment.

## Conclusion

In assessing the Speaker's chance of success on the merits of his appeal and in balancing the slight and temporary injury he faces absent a stay, we must conclude that the Speaker has not met his burden of establishing that a stay ought to be granted.

MOTION DENIED

KANNE, *Circuit Judge*, dissenting. Because I believe the Speaker's likelihood of success on the merits is greater than the majority deems it, and the balancing of the equities favors granting a stay, I respectfully dissent.

The only time the Supreme Court considered the constitutionality of legislative prayer it approved of the practice. *Marsh v. Chambers*, 463 U.S. 783 (1983). A key dispute in this case, as it appears now, is whether *Marsh* rests on a line drawn between sectarian and nonsectarian legislative prayer. While there is caselaw supporting the proposition that *Marsh* approves of only nonsectarian legislative prayer, there still remain powerful arguments to the contrary, not the least of which is the *Marsh* majority's curious ambiguity on the point. Moreover, other factual differences may drive the ultimate ruling in this case. The nuanced nature of Establishment Clause jurisprudence in general and the recognized status of legislative prayer as holding its own unique place in our nation's history make it difficult, if not impossible, to say that the Speaker lacks a significant probability of success on the merits.

While I see strong legal arguments for both parties as to the merits, my real disagreement with the majority centers on the balancing of the equities. At the outset, it should be noted that the harm to the plaintiffs is not that their speech is being restricted. Thus, this is not a case where absent immediate relief speech will be diluted or lost. *See Elrod v. Burns,* 427 U.S. 347, 373-74 n.29 (1976) (emphasizing the importance of the timeliness of political speech in conveying the intended message) (citations omitted); *see also ACLU v. City of St. Charles*, 794 F.2d 265, 274 (7th Cir. 1986) (noting the distinction between free speech and establishment of religion in determining irreparable harm). This is also not a case where the state

is interfering with the plaintiffs' ability to freely exercise their religious beliefs. *City of St. Charles*, 794 F.2d at 274. The potential harm in this case, assuming that the legislative prayer at issue is unconstitutional, is a harm to the public in general: the erosion of religious liberty and freedom that may arise due to a state's impermissible affiliation with religion. *Id.* at 275. Such a harm is of the greatest importance—the Establishment Clause, of course, represents a value held so highly by the Framers that it was included in the First Amendment. But it does not follow that the religious freedoms we hold so dear will be irreparably injured in the time that it takes this court, and possibly the United States Supreme Court, to evaluate the constitutionality of Indiana's legislative prayer. Any doubt on this issue is dispelled by the fact that the Indiana General Assembly has been engaged in this practice for nearly two centuries.

The harm which leads me to conclude that a stay should be granted is also of a public nature. Federalism concerns demand that we recognize the important interest the Indiana General Assembly has in conducting its internal practice of legislative prayer unfettered by a federal court's injunction—even one narrowly drawn. The injunction issued in this case covers a deeply rooted tradition that "has become part of the fabric of our society." *Marsh*, 463 U.S. at 792. More to the point, this is a "special case" that deals with another sovereign's "internal spiritual practices." *Van Zandt v. Thompson*, 839 F.2d 1215, 1219 (7th Cir. 1988). And as such, we owe deference to the Indiana General Assembly's practice with regard to legislative prayer. *Id.* (explaining that *Marsh* reflects a "degree of deference to the internal spiritual practices of another . . . sovereign"). That deference cautions that we as federal judges should move prudently in this very sensitive area of constitutional law, which

includes being reluctant to interfere with a state's internal spiritual practices until it is clear that it is necessary.

Deference is certainly due here. The Indiana General Assembly, democratically elected by the citizens of the State of Indiana, has been opening its sessions with a prayer or invocation, frequently delivered by a religious cleric, for the last 188 years. If for those past 188 years the legislative prayer at issue here has occurred on the wrong side of what is at best a murky constitutional line, then we can at least provide the clarity of our opinion before placing a state legislative body under federal supervision.

The legal uncertainty caused by the special place legislative prayer holds in our nation's heritage and our Establishment Clause jurisprudence, the absence of irreparable harm, and the deference due to another sovereign's internal spiritual practices require that we stay the district court's injunction at least until we can determine for ourselves whether a constitutional violation has occurred.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
