In the

# United States Court of Appeals
## For the Seventh Circuit

———

No. 05-3451

EUGENE WINKLER, GARY GERSEN, TIMUEL BLACK,
MARY CAY MARUBIO, and C. DOUGLAS FERGUSON,

*Plaintiffs-Appellees,*

*v.*

ROBERT M. GATES, Secretary of Defense,

*Defendant-Appellant.*

———

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99-2424—**Blanche M. Manning**, *Judge.*

———

ARGUED APRIL 6, 2006—DECIDED APRIL 4, 2007

———

Before BAUER, WOOD, and SYKES, *Circuit Judges.*

WOOD, *Circuit Judge.* This appeal presents another
variation on the question whether taxpayers have stand-
ing to challenge a governmental action that allegedly
violates the Establishment Clause—an issue that arises
with some regularity. See *Freedom From Religion Founda-
tion, Inc. v. Chao*, 433 F.3d 989 (7th Cir. 2006), *cert.
granted sub nom. Hein v. Freedom From Religion Founda-
tion, Inc.*, 127 S.Ct. 722 (2006) (No. 06-157); *Hinrichs v.
Bosma*, 440 F.3d 393 (7th Cir. 2006); *Laskowski v. Spell-
ings*, 443 F.3d 930 (7th Cir. 2006), as modified on rehear-

ing, 456 F.3d 702 (7th Cir. 2006). Each of these cases addresses challenging issues in an area of law in which the law is by no means clear.

Here, the taxpayers' target is a federal statute, 10 U.S.C. § 2554, that requires the United States military to assist the Boy Scouts of America (BSA) organization with its Jamboree, a national event held every four years. Plaintiff Eugene Winkler and others (to whom we refer collectively as Winkler) sued the Secretary of Defense claiming that the Jamboree statute violates the Establishment Clause because it requires the government to support an organization—BSA—that conditions membership upon a belief in God and thus that excludes believers in religions that are not based on one or more Deities, agnostics, and atheists. The Secretary moved to dismiss on the ground that taxpayer standing did not exist on these facts, but the district court ruled that standing was proper. It then found that BSA is a religious organization and that the direct public subsidy of the Jamborees violated the Establishment Clause.

We conclude that Winkler does not have standing to challenge the Jamboree statute. We therefore do not reach the complex question whether aid to a civic organization that conditions membership on a particular religious belief but that does not otherwise exclude people from its activities violates the Establishment Clause.

**I**

Standing jurisprudence, as the Supreme Court has explained, contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, see *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-62 (1992); and prudential standing, which embodies " 'judicially self-imposed limits on the exercise of

federal jurisdiction,' *Allen [v. Wright]*, 468 U.S. [737,] 751 [(1984)]." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004). As the *Lujan* Court put it, there are three elements of Article III standing: injury in fact, a causal connection between the injury and the defendant's conduct, and likely redressability through a favorable decision. 504 U.S. at 560-61. Prudential standing is somewhat harder to define, but *Newdow* "explained that prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.'" 542 U.S. at 12 (quoting *Allen*, 468 U.S. at 751). It is the latter branch of standing doctrine that concerns us in this appeal.

At one time, the Supreme Court did not recognize any doctrine of taxpayer standing in federal court. A taxpayer's stake in any government action, the Court pointed out, "is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, [is] so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." *Frothingham v. Mellon*, 262 U.S. 447, 487 (1923). See also *Doremus v. Bd. of Educ. of Borough of Hawthorne*, 342 U.S. 429 (1952). This restraint on standing remains the general rule today. See, *e.g.*, *Bennett v. Spear*, 520 U.S. 154, 167 (1997); *Lujan*, 504 U.S. at 560-61.

*Flast v. Cohen*, 392 U.S. 83 (1968), recognized a narrow but important modification to the *Frothingham* rule. In *Flast,* the Court began by addressing the question whether *Frothingham* had announced a constitutional ban against taxpayer standing, derived from Article III, or if "the Court

was simply imposing a rule of self-restraint which was not constitutionally compelled." 392 U.S. at 92. Although the government there argued that *Frothingham* had been constitutionally compelled, *id.*, the Court noted that the reasons given in the earlier case "suggest[ed] that the Court's holding rest[ed] on something less than a constitutional foundation." *Id.* at 93. In the end, after noting that standing, like the other justiciability doctrines, involves a "blend of constitutional requirements and policy considerations," *id.* at 99, the Court found that there is "no absolute bar in Article III to suits by federal taxpayers challenging allegedly unconstitutional federal taxing and spending programs," *id.* at 101. Put differently, although Article III may usually bar taxpayer standing, it does not always have that effect. *Cf. DaimlerChrysler Corp. v. Cuno*, 126 S.Ct. 1854, 1861-63 (2006) (rejecting state taxpayer standing to challenge state law on Commerce Clause grounds). The *Flast* Court described the concededly limited set of cases in which a litigant would have standing to assert claims solely in her capacity as a taxpayer:

> First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. . . . Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged.

392 U.S. at 102-03. The plaintiffs in *Flast* wanted the court to enjoin the expenditure of federal funds under the Elementary and Secondary Education Act of 1965. Those

funds, they alleged, were being used to support religious schools in violation of the Establishment Clause. The Court found that the required nexus existed where the constitutional infringement alleged amounted to a direct violation of the Establishment Clause. *Id.* at 103-04. The Court distinguished *Frothingham* as a challenge under the Due Process Clause, which, unlike the Establishment Clause, does not impose a specific limitation on Congress's power to tax and spend. *Id.* at 104-05. In the present case, Winkler is claiming that a particular statute violates the Establishment Clause. Just as in *Flast,* that is enough to show the required nexus between his status as a taxpayer and the alleged constitutional infringement.

The more difficult question is whether the Jamboree statute is the type of legislative enactment that the *Flast* Court had in mind. Is it an "exercise[ ] of congressional power under the taxing and spending clause of Art. I, § 8," or do we have only an "incidental expenditure of tax funds in the administration of an essentially regulatory statute"? 392 U.S. at 102-03. The Supreme Court has provided some guidance for the way in which that question should be approached. The two most important cases for present purposes are *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464 (1982), and *Bowen v. Kendrick*, 487 U.S. 589 (1988).[1]

---

[1] We recognize that the Court will have more to say about this area in *Freedom from Religion.* The questions presented in that case, however, reveal that no party is asking the Supreme Court to *expand* taxpayer standing. Petitioners, represented by the Solicitor General, phrase the question as follows: "Whether taxpayers have standing under Article III of the Constitution to challenge, on Establishment Clause grounds, the actions of Executive Branch officials pursuant to an Executive Order,

(continued...)

   In *Valley Forge*, the plaintiffs challenged the decision of
the Secretary of Health, Education, and Welfare to trans-
fer a defunct property that had once been a military
hospital to Valley Forge Christian College. The Secretary
was authorized to make that decision under a federal
statute permitting the transfer of surplus property to
private and public entities that might make use of it. The
Supreme Court found that the plaintiffs had no stand-
ing to challenge the Secretary's action in court, because
the challenged action was not an exercise of the taxing and
spending power. Instead, the statute authorizing the
administrative decision had relied upon Congress's power
under the U.S. Constitution's Property Clause, Art. IV,
§ 3, cl. 2. See 454 U.S. at 480. The Court took note of how
far removed the action that the executive took in *Valley
Forge* was from the imposition of a tax:

   Although not necessary to our decision, we note that
   any connection between the challenged property
   transfer and respondents' tax burden is at best specu-
   lative and at worst nonexistent. Although public
   funds were expended to establish Valley Forge

_____

[1] (...continued)
where the conduct at issue is financed only indirectly through
general appropriations legislation and no funds are disbursed to
any institutions or individuals outside the government." Respon-
dents ask "Whether the standing principle recognized in *Flast v.
Cohen*, 392 U.S. 83 (1968), and reaffirmed unanimously in *Bowen
v. Kendrick*, 487 U.S. 605 (1988), permits taxpayers to challenge
on Establishment Clause grounds an expenditure of funds
pursuant to a congressional authorization when that expenditure
is fairly traceable to the allegedly unconstitutional conduct."
Since, as we explain in this opinion, we conclude that standing
is lacking even under the theories the *Freedom from Religion*
respondents are urging the Court to adopt, we see no reason to
hold this case for the Court's decision.

> General Hospital, the land was acquired and the facilities constructed 30 years prior to the challenged transfer. . . . Moreover, each year of delay in disposing of the property depleted the Treasury by the amounts necessary to maintain a facility that had lost its value to the Government.

*Id.* at 480 n.17. This footnote, while perhaps technically *dicta*, sheds some light on why the Supreme Court saw the statute in question as one based primarily (even if not exclusively) on the Property Clause.

Six years after *Valley Forge*, the Supreme Court revisited taxpayer standing in *Bowen*. In that case, taxpayers claimed that a federal grant program that Congress had enacted and had entrusted to an executive agency for implementation violated the Establishment Clause. Without discussing standing at any length, the Court held that the law was not unconstitutional on its face. 487 U.S. at 617-18. Turning to the taxpayers' challenge to the law as applied, however, the Court identified the first question as whether the taxpayers had standing to pursue their claim. *Id.* at 618. It concluded that they did:

> We do not think, however, that appellees' claim that AFLA funds are being used improperly by individual grantees is any less a challenge to congressional taxing and spending power simply because the funding authorized by Congress has flowed through and been administered by the Secretary. Indeed, *Flast* itself was a suit against the Secretary of HEW, who had been given authority under the challenged statute to administer the spending program that Congress had created. . . . [W]e have not questioned the standing of taxpayer plaintiffs to raise Establishment Clause challenges, even when their claims raised questions about the administratively made grants. . . . Nor is this, as we stated in *Flast*, a challenge to "an inciden-

tal expenditure of tax funds in the administration of an essentially regulatory statute." The AFLA is at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers, and appellees' claims call into question how the funds authorized by Congress are being disbursed pursuant to the AFLA's statutory mandate. In this litigation there is sufficient nexus between the taxpayer's standing as a taxpayer and the congressional exercise of taxing and spending power, notwithstanding the role the Secretary plays in administering the statute.

*Id.* at 619-20 (internal citation omitted). The question for us, briefly put, is whether the Jamboree statute is more like the surplus property act in *Valley Forge* or more like the AFLA program in *Bowen.* (Although this aspect of prudential standing requires us to peek at the merits of the case, this overlap is inevitable under existing law, which requires us to ask whether the expenditure of funds was or was not "incidental.")

## II

Whether a party has standing to bring a "case or controversy" before the court is a question of law that this court reviews *de novo. Wisconsin Right to Life, Inc. v. Schober*, 366 F.3d 485, 489 (7th Cir. 2004). If there were factual questions, we would review the district court's factual determinations for clear error. *Id.*

Because the Jamboree statute, 10 U.S.C. § 2554, is central to our decision, we begin with its text. The statute has been altered several times over the years, most recently during the pendency of this litigation. For the convenience of the reader, we reproduce it in full, despite its length:

§ 2554. Equipment and other services: Boy Scout Jamborees

(a) The Secretary of Defense is hereby authorized, under such regulations as he may prescribe, to lend to the Boy Scouts of America, for the use and accommodation of Scouts, Scouters, and officials who attend any national or world Boy Scout Jamboree, such cots, blankets, commissary equipment, flags, refrigerators, and other equipment and without reimbursement, furnish services and expendable medical supplies, as may be necessary or useful to the extent that items are in stock and items or services are available.

(b) Such equipment is authorized to be delivered at such time prior to the holding of any national or world Boy Scout Jamboree, and to be returned at such time after the close of any such jamboree, as may be agreed upon by the Secretary of Defense and the Boy Scouts of America. No expense shall be incurred by the United States Government for the delivery, return, rehabilitation, or replacement of such equipment.

(c) The Secretary of Defense, before delivering such property, shall take from the Boy Scouts of America, good and sufficient bond for the safe return of such property in good order and condition, and the whole without expense to the United States.

(d) The Secretary of Defense is hereby authorized under such regulations as he may prescribe, to provide, without expense to the United States Government, transportation from the United States or military commands overseas, and return, on vessels of the Military Sealift Command or aircraft of the Air Mobility Command for (1) those Boy Scouts, Scouters, and officials certified by the Boy Scouts of America, as representing the Boy Scouts of America at any national or world Boy Scout Jamboree, and (2) the

equipment and property of such Boy Scouts, Scouters, and officials and the property loaned to the Boy Scouts of America, by the Secretary of Defense pursuant to this section to the extent that such transportation will not interfere with the requirements of military operations.

(e) Before furnishing any transportation under subsection (d), the Secretary of Defense shall take from the Boy Scouts of America, a good and sufficient bond for the reimbursement to the United States by the Boy Scouts of America, of the actual costs of transportation furnished under this section.

(f) Amounts paid to the United States to reimburse it for expenses incurred under subsection (b) and for the actual costs of transportation furnished under subsection (d) shall be credited to the current applicable appropriations or funds to which such expenses and costs were charged and shall be available for the same purposes as such appropriations or funds.

(g) In the case of a Boy Scout Jamboree held on a military installation, the Secretary of Defense may provide personnel services and logistical support at the military installation in addition to the support authorized under subsections (a) and (d).

(h) Other departments of the Federal Government are authorized, under such regulations as may be prescribed by the Secretary thereof, to provide to the Boy Scouts of America, equipment and other services, under the same conditions and restrictions prescribed in the preceding subsections for the Secretary of Defense.

(i)(1) The Secretary of Defense shall provide at least the same level of support under this section for a national or world Boy Scout Jamboree as was pro-

vided under this section for the preceding national or world Boy Scout Jamboree.

(2) The Secretary of Defense may waive paragraph (1), if the Secretary—

(A) determines that providing the support subject to paragraph (1) would be detrimental to the national security of the United States; and

(B) submits to Congress a report containing such determination in a timely manner, and before the waiver takes effect.

Since the entire purpose of this statute is to aid the Boy Scouts with their marquee program, the Jamboree, we must also look briefly at who they are and why this controversy arose. The Boy Scout movement was founded in 1907 in England by Lord Robert Baden-Powell. Three years later, in 1910, William D. Boyce founded BSA as a private, nonprofit organization. In 1916, in recognition of BSA's record of public service, Congress granted BSA a federal charter. See 36 U.S.C. § 30901 *et seq*. As of the time the record in this case was compiled, there were over three million youth and one million adult volunteers participating in the organization.

Few would dispute the fact that the Boy Scouts have, over the years, provided a valuable outlet for countless young people. The issue here, however, is whether (or to what extent) it should be viewed as a religious organization. Without a doubt, there are some religious aspects to scouting. The Boy Scout Oath begins with the phrase "On my honor I will do my best To do my duty to God and my Country . . . ." The Scout Law demands, among other things, that a Scout "is Reverent toward God. He is faithful in his religious duties. He respects the beliefs of others." Scouting is not, however, affiliated with any particular religious denomination; to the contrary, BSA

welcomes young people of every religion as well as those who are not affiliated with any organized religion, so long as they are willing to accept the Oath and the Scouting laws. BSA admits that atheists and agnostics are ineligible for membership or leadership positions in Scouting. On the other hand, significantly for the specific issue before us, anyone, including members of the general public, may attend the Jamboree. Although certain aspects of the BSA's membership rules have led to litigation in recent years (particularly its stand with respect to sexual orientation), see *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), *Boy Scouts of America v. Wyman*, 335 F.3d 80 (2d Cir. 2003), *Evans v. City of Berkeley*, 129 P.3d 394 (Cal. 2006), those matters are not important to our decision here.

The Boy Scouts have been holding Jamborees since 1937, long before this statute was passed. Throughout that time, the U.S. military has supported the Jamboree by loaning military equipment and by providing various logistical and other services. It was not until 1972 that Congress expressly sanctioned this practice by passing the Jamboree statute. It did so because the military believes that the Scouts provide unique opportunities for the secular purposes of military recruitment and positive public relations for the Armed Forces. In 2001, the Boy Scout Jamboree drew more than 40,000 Scouts and leaders to Fort A.P. Hill in Virginia, which has served as the National Scout Jamboree's permanent home since 1981.

The Jamboree statute is only one of several mechanisms by which the BSA obtains or could obtain federal support for the Jamboree. For example, 10 U.S.C. § 2667(a) permits the leasing of real or personal military property to private groups if such as arrangement would "promote the national defense or be in the public interest." Unlike the Jamboree statute, 10 U.S.C. § 2667 does not mention the BSA by name. Likewise, 10 U.S.C. § 2012 authorizes the

Secretary to allow the armed forces to provide support to private groups if "the provision of such assistance is incidental to military training." 10 U.S.C. § 2012(a)(2). That statute does name the BSA and 12 other organizations as eligible for assistance, and it permits the Secretary to expand the list on a "case-by-case basis." 10 U.S.C. § 2012(e)(3).

These statutes, together with the Jamboree statute, do not establish the kind of "classic" taxing and spending program that the Court evaluated in *Flast* or *Bowen*, or that this court considered in *Laskowski*. No governmental office gives out any grants to the BSA or any other group or institution, religious or otherwise. Much of the support given is in the form of "loans." Indeed, 10 U.S.C. § 2554(b) requires the BSA to foot the bill for expenses related to the "delivery, return, rehabilitation, or replacement" of the loaned equipment, and the repeated refrain of § 2554(d) is that various services must be provided "without expense" to the United States. BSA must give bonds to ensure that its bill is paid. See § 2554(c) (equipment) and (e) (transportation). The Secretary would like us to draw the standing line here: if § 2554 does not authorize either a grant or direct subsidy to the BSA, he argues, then the taxpayers do not have standing.

*Bowen*, however, did not endorse this bright-line test. In his brief before this court, the Secretary concedes that the military spends a significant amount of money on the Jamborees. None of that money is given directly to BSA. Instead, it is all spent by the military to furnish services in kind. Although, as the Secretary suggests, the government would be footing the bill for at least some of those services by paying the soldiers' salaries regardless of what duties the soldiers are assigned, that does not change the fact that the personnel assisting the Jamboree are donating the value of their taxpayer-funded labor to the BSA. (We doubt that the Secretary would make the same

argument if the soldiers in question were building a swimming pool for the local base commander.) In addition, the military hires temporary workers to perform Jamboree-related services, and it purchases supplies earmarked for the Jamboree.

The military spent $6 million on the 1997 Jamboree, almost $8 million on the one in 2001, and—until the district court's injunction—it was scheduled to spend another $7.3 million on the 2005 Jamboree. This averages out to almost $2 million per year per Jamboree on expenses including the military's transportation of its personnel to Fort A.P. Hill, rental of commercial equipment such as trucks, and purchasing a range of disposable goods such as medical supplies and cookie dough. That level of spending of federal tax dollars, while a tiny fraction of the Pentagon's budget, can hardly be called incidental. (For Fiscal Year 2008, the President has requested $481.4 billion in discretionary authority for the Department of Defense. See http://www.dod.mil/comptroller/defbudget/fy2008/2008_Budget_Rollout_Release.pdf.) As we have said, the fact that the support given to the BSA is "in kind" rather than by cash or check cannot be the dividing line. Building a church and providing all of its supplies must be equally offensive to the Establishment Clause as giving the church the money to do the construction and purchase of supplies itself. Election law provides a good analogy: a candidate must disclose not only cash contributions but also coordinated expenditures. The reason is simple: money is fungible and the value of the services rendered or supplies given to a candidate is equal to that of the check that might have otherwise been written by the donor. *Cf. Shays v. Federal Election Com'n*, 414 F.3d 76, 97-98 (D.C. Cir. 2005) (discussing the Federal Election Campaign Act's definitions of contributions and coordinated expenditures and when under the statute the latter are classified as the former).

More persuasively, the Secretary contends that Winkler lacks standing because the Jamboree statute is not a "taxing and spending" statute but rather is authorized by Congress's powers under the Property Clause, Art. IV, § 3, cl. 2, and the Military Clauses, Art. I, § 8, cls. 12-14. The military is, in other words, just regulating its own property and manpower. Winkler responds that even if Congress is exercising its authority under the Property and/or Military Clauses in this statute, the statute also necessarily relies on the Taxing and Spending Clause, Art. I, § 8, cl. 1. He argues that taxpayers have standing to challenge this statute because "[s]pending is the challenged conduct, and not just a means to accomplish the challenged conduct." To adopt Winkler's position, however, would be to abolish the line that the Supreme Court drew between *Valley Forge* and *Bowen*, because exactly the same thing could have been said about the surplus property program in *Valley Forge*. Indeed, it is hard to imagine how Congress could exercise any of its constitutional powers without some incidental use of the taxing and spending power.

Congress usually does not indicate which of its manifold powers it is exercising when it passes a particular piece of legislation, and some pieces of legislation undoubtedly rest on multiple constitutional clauses. The Jamboree statute is a good example. It apparently relies, in part, on the Property Clause, Art. IV, § 3, cl. 2; the Military Clauses, Art. I, § 8, cls. 12-14; and even the Commerce Clause, Art. I, § 8, cl. 3. (The Jamboree affects interstate commerce by drawing thousands of travelers to the Commonwealth of Virginia. In an *amicus* brief, a group of Virginia politicians pointed out that BSA alone spent $17 million in Virginia for the 2005 Jamboree, and individual scouts and other visitors to the Jamboree obviously added much more to the total.)

The text of the Jamboree statute that we reproduced earlier is also informative. Even assuming that it is correct to characterize the BSA as a "religious" organization, this statute is for the purpose of assisting the military in persuading a new generation to join its ranks and in building good will. This is a secular and valid purpose. *Cf. Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 126 S.Ct. 1297 (2006) (upholding statute requiring law schools to offer military recruiters same access to campuses and students as most favored nonmilitary recruiters had). Although some support of the organization does occur, the statute does not turn money or services over to BSA to handle any way it wants. Indeed, most of the services the military furnishes are underwritten by BSA, because Congress has insisted on revenue-neutrality for the United States.

Despite the fact that § 2554(h) authorizes other departments to follow the military's lead, it is first and foremost a statute about the use, disposal, and provision of military resources—including equipment, land, and soldiers. The district court relied on the absence of recruiting or training as a purpose in the statute itself or the 1972 Senate report, see S.R. 92-631 (1972), reprinted in 1972 U.S.C.C.A.N. 2022, but it overlooked the fact that the 1972 report focused on the potential international ramifications of supporting the Jamboree:

> The theme of the 1971 Jamboree, For Understanding, prevailed in all facets of jamboree activities. The 7,800 American scouts in attendance, identified by the stars and stripes on their uniforms, received great applause and admiration wherever they appeared. One of the most significant results of the jamboree was the fellowship and understanding for other peoples the Boy Scouts of America obtained from their association with the scouts of all nations. The international rapport achieved made the equipment loaned and time spend [*sic*] by the Department of Defense and other Govern-

ment agencies in coordinating the services to the American contingent very worthwhile.

1972 U.S.C.C.A.N. at 2024.

Although Winkler questions whether the military is investing its time and money wisely when it uses the Jamboree to further its broader goals, that concern is far removed from the Establishment Clause. Furthermore, a court is poorly equipped to second-guess the military's own assessment of the benefits of the Jamboree. In a time when the armed forces regularly spend significant funds both for recruitment and public relations, Congress's decision to authorize them to take advantage of a built-in audience of potential recruits is reasonably related to the activities authorized by the Military Clauses. We are satisfied that this purpose is apparent even in the legislation that was before the district court. Nonetheless, we note for the sake of completeness that Congress took steps to clarify its purpose in a later act. Pub.L. 109-148, Div. A, Title VIII, § 8126(c)(1), Dec. 30, 2005, 119 Stat. 2729, reads as follows:

(1) Findings.—Congress makes the following findings:

(A) Section 8 of article I of the Constitution of the United States commits exclusively to Congress the powers to raise and support armies, provide and maintain a Navy, and make rules for the government and regulation of the land and naval forces.

(B) Under those powers conferred by section 8 of article I of the Constitution of the United States to provide, support, and maintain the Armed Forces, it lies within the discretion of Congress to provide opportunities to train the Armed Forces.

(C) The primary purpose of the Armed Forces is to defend our national security and prepare for combat should the need arise.

(D) One of the most critical elements in defending the Nation and preparing for combat is training in conditions that simulate the preparation, logistics, and leadership required for defense and combat.

(E) Support for youth organization events simulates the preparation, logistics, and leadership required for defending our national security and preparing for combat.

(F) For example, Boy Scouts of America's National Scout Jamboree is a unique training event for the Armed Forces, as it requires the construction, maintenance, and disassembly of a 'tent city' capable of supporting tens of thousands of people for a week or longer. Camporees at the United States Military Academy for Girl Scouts and Boy Scouts provide similar training opportunities on a smaller scale.

This case is like the Third Circuit's case, *Americans United for Separation of Church and State v. Reagan*, 786 F.2d 194 (3d Cir. 1986), in which federal taxpayers challenged congressional actions funding the diplomatic mission to the Vatican as a violation of the Establishment Clause. In that case, the Third Circuit noted that the expenditure at issue was not one "for which authority is found only in article I, section 8, clause 1." *Id.* at 199. Instead, the actual bill challenged was a repeal of an 1867 law banning funding of a mission in Rome. The Third Circuit noted that the power being exercised was not that of appropriation, but that of "the conduct of foreign affairs" and that the Supreme Court in *Flast* "by carefully limiting taxpayer standing to challenges of expenditures solely dependent upon the taxing and spending clause, made clear that one's status as a taxpayer did not confer upon one standing to challenge the exercise of other governmental powers . . . ." *Id.* See also *Phelps v. Reagan*, 812 F.2d 1293 (10th Cir. 1987) (following the Third Circuit).

We reiterate finally that the activity Congress has chosen to support—the Jamboree—is one that is open to all, not just to members of BSA. We conclude, in light of all these facts, that the Jamboree Statute is primarily an exercise of Congress's powers under the Military and, to a lesser extent, Property Clauses. While the use of those powers necessarily requires some incidental spending, the statute is not the kind of "taxing and spending" legislation identified in *Flast* as suitable for a taxpayer challenge.

## III

Because plaintiffs do not have standing to bring this case, we REVERSE the judgment of the district court and REMAND for dismissal of the action.

SYKES, *Circuit Judge*, concurring.   I agree with the majority's conclusion that the plaintiff taxpayers lack standing to challenge the Boy Scout Jamboree statute, 10 U.S.C. § 2554. I do not agree, however, with several aspects of the majority's standing analysis. My primary objection is to the assertion, made by this court in *Freedom from Religion Found., Inc. v. Chao*, 433 F.3d 989, 991 (7th Cir. 2006), *cert. granted sub nom. Hein v. Freedom from Religion Found., Inc.*, 127 S. Ct. 722 (2006), and repeated here, maj. op. at 3, 8, that taxpayer standing doctrine is merely prudential; it is not. The *Frothingham* rule against taxpayer suits enforces the standing requirements of

Article III's case-or-controversy limitation on federal judicial power, a fundamental feature in the Constitution's separation of powers. *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1861-63 (2006); *Bowen v. Kendrick*, 487 U.S. 589, 618-20 (1988); *Valley Forge Christian Coll. v. Amns. United for Separation of Church & State, Inc.*, 454 U.S. 464, 477-80 (1982); *United States v. Richardson*, 418 U.S. 166, 171-73 (1974); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974); *Flast v. Cohen*, 392 U.S. 83, 101-06 (1968); *Doremus v. Bd. of Educ.*, 342 U.S. 429, 433-34 (1952); *Frothingham v. Mellon*, 262 U.S. 447, 486-89 (1923).

*Frothingham* involved a taxpayer's due process challenge to the Maternity Act of 1921, which provided federal funding to the states for maternal and infant health. The Court held the taxpayer could not bring the claim, noting that a "party who invokes the power [of judicial review] must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Frothingham*, 262 U.S. at 488. A taxpayer's "interest in the moneys of the treasury . . . is shared with millions of others, is comparatively minute and indeterminable, and the effect upon future taxation, of any payment out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for an appeal to the preventive powers of a court of equity." *Id.* at 487. The Court noted that if a single taxpayer may challenge a statute, "then every other taxpayer may do the same, not only in respect of the statute here under review, but also in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned." *Id.* To entertain such a suit, the Court held, would be "not to decide a judicial controversy, but to assume a

position of authority over the governmental acts of another and coequal department, an authority which plainly we do not possess." *Id.* at 489.

The *Flast* exception to the *Frothingham* rule—invoked by the plaintiff taxpayers here—likewise addresses *constitutional* standing requirements in the context of Establishment Clause challenges to exercises of the congressional taxing and spending power. *Flast*, 392 U.S. at 101-06. Any question about the constitutional or prudential status of the Supreme Court's taxpayer standing doctrine was resolved in *Flast* itself. Along the way to announcing a narrow exception to the *Frothingham* bar against taxpayer standing, the Supreme Court in *Flast* undertook a "fresh examination of the limitations upon standing to sue in a federal court and the application of those limitations to taxpayer suits" and grounded its "fresh examination" in Article III. *Id.* at 94.

The Court said in *Flast* that the question whether plaintiffs may sue in federal court solely in their capacity as taxpayers "turns on whether they can demonstrate the necessary stake as taxpayers in the outcome of the litigation *to satisfy Article III requirements.*" *Id.* at 102 (emphasis added). The Court held that "a taxpayer will have standing *consistent with Article III* to invoke federal judicial power when he alleges that congressional action under the taxing and spending clause is in derogation of those constitutional provisions which operate to restrict the exercise of the taxing and spending power." *Id.* at 105-06 (emphasis added). Because "the Establishment Clause of the First Amendment . . . specifically limit[s] the taxing and spending power conferred by Art. I, § 8," the Court held that taxpayers will have standing to assert Establishment Clause challenges "only [to] exercises of congressional power under the taxing and spending clause." *Id.* at 102, 105. The *Flast* plaintiffs sued to enjoin federal

appropriations made to religious schools pursuant to the Elementary and Secondary Education Act of 1965; the Court found a "logical nexus" between their status as taxpayers and the claim that the Education Act was an unconstitutional exercise of the taxing and spending power in violation of the Establishment Clause and permitted the claim to proceed. *Id.* at 102-03. But *Flast* left the *Frothingham* rule in place: The Court said the case-or-controversy requirements of Article III will not be satisfied "where a taxpayer seeks to employ a federal court as a forum in which to air his generalized grievances about the conduct of government or the allocation of power in the Federal System." *Id.* at 106.

In *Richardson*, the Court observed that *Flast* had clarified the question whether the *Frothingham* prohibition against taxpayer standing derived from the requirements of Article III or was merely a prudential policy judgment. *Richardson*, 418 U.S. at 172-73. "When the Court addressed the question of standing in *Flast,* Mr. Chief Justice Warren traced what he described as the 'confusion' following *Frothingham* as to whether the Court had announced a constitutional doctrine barring suits by taxpayers challenging federal expenditures as unconstitutional or simply a policy rule of judicial self-restraint." *Richardson*, 418 U.S. at 172. The *Richardson* Court noted that Chief Justice Warren's "fresh examination" of standing doctrine in *Flast* led to a *constitutional* holding on the question of taxpayer standing. *Id.* at 173 ("[T]he [*Flast*] Court emphasized that Art. III requirements are the threshold inquiry.").

To the extent any ambiguity remained after *Richardson*, *Valley Forge* surely cleared it up. There, as the majority notes, the Court declined to expand *Flast*, holding that taxpayers did not have standing to challenge a federal agency's decision to transfer an unused Army hospital to

Valley Forge Christian College. The Court reasoned that the taxpayers' claim did not fall within the narrow exception announced in *Flast* because they challenged an executive—not congressional—action, and because the authorizing legislation, the Federal Property and Administrative Services Act of 1949, was an exercise of the Property Clause power under Article IV, Section 3, Clause 2, not an exercise of the taxing and spending power under Article I, Section 8. *Valley Forge*, 454 U.S. at 479-80.

*Valley Forge* could not have been clearer about the foundations of the Court's taxpayer standing doctrine. The Court held that although "[t]he term 'standing' subsumes a blend of constitutional requirements and prudential considerations," the "irreducible minimum" of Article III standing "requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, . . . and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Id.* at 471-72 (citations and quotations omitted). Quoting *Frothingham,* the Court reaffirmed that taxpayers generally cannot establish these minimums because "[a]ny tangible effect of the challenged statute on the plaintiff's tax burden [is] 'remote, fluctuating and uncertain,'" and the asserted injury is not distinct and particularized but instead is shared "'in common with people generally.'" *Id.* at 477 (quoting *Frothingham*, 262 U.S. at 487-88). Taxpayers seeking to establish standing under *Flast* must assert an injury from a specific congressional exercise of the Article I, Section 8 taxing and spending power alleged to be in violation of the Establishment Clause.

Recognizing *Flast*'s potential to impermissibly enlarge the judicial role if extended beyond its terms, the Court in *Valley Forge* cautioned that *Flast* should not be understood to have relaxed the injury-in-fact and redressability

requirements of constitutional standing in Establishment Clause cases and insisted that the exception it created be applied with "rigor." *Id.* at 481, 488-90. Indeed, the Court has strictly limited the reach of *Flast,* confining it to Establishment Clause claims, *see DaimlerChrysler*, 126 S. Ct. at 1864, and actions to enjoin a direct disbursement of public funds pursuant to a specific congressional appropriation, *see Bowen*, 487 U.S. at 618 ("[W]e have consistently adhered to *Flast* and the narrow exception it created to the general rule against taxpayer standing in *Frothingham*."); *see also Freedom from Religion*, 433 F.3d at 998 (Ripple, J., dissenting) (*Flast* "survives as a narrow exception to . . . [the] ban on generalized grievances"; expanding *Flast* to allow taxpayers to challenge an executive branch activity conducted with general appropriation funds "cuts the concept of taxpayer standing loose from its moorings."); *Laskowski v. Spellings*, 443 F.3d 930, 939 (7th Cir. 2006) (Sykes, J., dissenting) ("The Supreme Court has steadfastly refused to expand *Flast* and has never recognized private party repayment to the Treasury as an appropriate remedy for an Establishment Clause violation in a suit based on taxpayer standing.").

If the rule against taxpayer standing derives from the requirements of Article III (and it does), its exception cannot be mere prudential judicial policy:

> [N]either the counsels of prudence nor the policies implicit in the "case or controversy" requirement should be mistaken for the rigorous Art. III requirements themselves. Satisfaction of the former cannot substitute for a demonstration of " 'distinct and palpable injury' . . . that is likely to be redressed if the requested relief is granted." That requirement states a limitation on judicial power, not merely a factor to be balanced in the weighing of so-called "prudential" considerations.

*Valley Forge*, 454 U.S. at 475 (citations omitted).

Curiously, my colleagues cite but do not discuss the Supreme Court's most recent statement on taxpayer standing, last term's unanimous opinion in *DaimlerChrysler*. There, the Court reaffirmed the *Frothingham* bar against taxpayer standing and declined to extend *Flast* to Commerce Clause claims. *DaimlerChrysler*, 126 S. Ct. at 1864-65. Nothing in *DaimlerChrysler* even remotely hints that the Court now considers taxpayer standing doctrine to be rooted in prudential policy considerations; to the contrary, the Court's opinion focused on the requirements of Article III and the case-or-controversy limitation on federal judicial power. Indeed, the Court referred to the *Frothingham* rule as "the Article III prohibition on taxpayer suits." *Id.* at 1865.

So this court was simply wrong to assert in *Freedom from Religion* that *Frothingham* and *Flast* "rested not on Article III . . . but rather on what have come to be called the 'prudential' principles of standing," which "like other common law principles, are protean and mutable." *Freedom from Religion*, 433 F.3d at 991-92. This mischaracterization of taxpayer standing doctrine permitted the *Freedom from Religion* majority to avoid a "rigorous" adherence to the limits of *Flast*, to dispense with the requirement of a specific congressional disbursement under the taxing and spending power, and to allow taxpayers to challenge a wholly executive-branch activity supported by general appropriations. *Id.* at 996-97. As Judge Ripple noted in dissent, this was a "dramatic expansion of current standing doctrine," encompassing an activity of government not at all like the congressional-grant programs at issue in *Flast* and *Bowen*—the only category of taxpayer "injury" that the Supreme Court has recognized as sufficient to allow a taxpayer Establishment Clause claim to proceed. *Id.* at 997.

It is true that the logic of *Flast* is difficult to reconcile with the basic requirements of Article III, *see Freedom from Religion Found., Inc. v. Chao*, 447 F.3d 988, 988-90 (Flaum, C.J., concurring in denial of rehearing en banc) (Easterbrook, J., concurring in denial of rehearing en banc); as the majority notes, the Supreme Court granted certiorari in *Freedom from Religion* and may bring greater clarity to this area of justiciability law. But we are not at liberty to recast a constitutional doctrine as a prudential one. We should not perpetuate the underlying doctrinal error of *Freedom from Religion* here.

Relatedly, I cannot agree with the majority's assertion that "no party" in *Freedom from Religion* "is asking the Supreme Court to *expand* taxpayer standing." Maj. op. at 5 n.1. To the contrary, because *Freedom from Religion* moved the boundaries of current taxpayer standing doctrine, the plaintiffs there, in defending this court's decision, are necessarily asking the Supreme Court to expand taxpayer standing.

The majority observes that the Jamboree statute, together with the other statutory sources of the military's authority to lend property and provide logistical support to the Jamboree, "do not establish the kind of 'classic' taxing and spending program that the Court evaluated in *Flast* or *Bowen*." Maj. op. at 13. I agree. But the same can be said about the presidential conferences at issue in *Freedom from Religion*. That case, like this one, challenges executive branch activity supported by general appropriations.

The majority rejects the argument that taxpayers will have standing under *Flast* only where the challenged statute "authorize[s] either a grant or direct subsidy" of the type at issue in *Bowen* and in *Flast* itself. Maj. op. at 13. "[T]he fact that the support given to the BSA is 'in kind' rather than by cash or check," the majority states,

"cannot be the dividing line. Building a church and providing all of its supplies must be equally offensive to the Establishment Clause as giving the church the money to do the construction and purchase of supplies itself." *Id.* at 14. Yet the majority relies on this distinction to support the conclusion that the plaintiffs here do not have standing: "Although some support of the organization does occur, the [Jamboree] statute does not turn money or services over to BSA to handle any way it wants." *Id.* at 16. Again, this logical tension may be inherent in *Flast'*s exception to *Frothingham*'s rule, *see Freedom from Religion*, 447 F.3d at 990 (Easterbrook, J., concurring in denial of rehearing en banc); the Supreme Court will provide guidance soon.

In the meantime, the better course is to follow the admonition in *Valley Forge,* apply the *Flast* exception to the *Frothingham* rule with "rigor," and limit *Flast*'s reach to factually similar claims until the Supreme Court tells us otherwise. That means no standing here, but for a threshold reason rejected by the majority: because the Jamboree statute does not establish a congressional grant or direct appropriation program of the type at issue in *Flast* and *Bowen.* It is, as the majority notes, a statute about the military's use and disposition of its land and equipment, and the assignment, training, and recruitment of soldiers. Maj. op. at 16. I fully agree with the majority's conclusion that the Jamboree statute rests primarily on the Military Clauses, Article I, Section 8, Clauses 12-14, and the Property Clause, Article IV, Section 3, Clause 2, and for this (additional) reason, the case resembles *Valley Forge* rather than *Flast* and *Bowen*.

I would also note that redressability is missing here. On appeal, the plaintiffs have focused their arguments on defending the district court's decision on standing and its injunction against the operation of the Jamboree statute. The district court rejected the plaintiffs' challenge to

certain other statutes authorizing the military to lend property and provide logistical support to the Jamboree, and they have apparently accepted that ruling. But the fact that the military has other statutory authority to assist the Jamboree, *see* 10 U.S.C. §§ 2012, 2667, maj. op. at 12-13, and was doing so for thirty-five years prior to the enactment of the Jamboree statute, undermines any argument that the "injury" from the statute is redressable. An injunction against § 2554 would not prevent the military from opening Fort A.P. Hill to the Boy Scouts and providing equipment and logistical support to the Jamboree under statutory authority upheld by the district court and not at issue here.

This brings me to my final point. The district court held that § 2554 violated the Establishment Clause and enjoined "the U.S. Secretary of Defense and his officers, agents, servants, employees and attorneys . . . from providing any aid to the Boy Scouts of America pursuant to 10 U.S.C. § 2554, *with the sole exception of aid provided or to be provided in support of the 2005 Jamboree that will take place from July 25 through August 3, 2005.*" (Emphasis added.) This order was dated June 22, 2005, and it notes that "[t]he injunction the plaintiffs are seeking specifically excludes the upcoming 2005 Jamboree." Whether the plaintiffs' forbearance in this regard was the product of generosity, the spirit of compromise, or a desire to avoid the public relations fallout that would have attended their eleventh-hour scuttling of the 2005 Jamboree (if that's what would have occurred), their conduct undermines any claim that they were suffering a grave constitutional injury. Constitutional litigation is legitimate only where there is a real injury and a legal remedy available to redress it. A willingness to postpone the remedy suggests that the plaintiffs' injury was not real but only a legal fiction to get their Establishment Clause claim before the court. But "Article III . . . is not merely a

troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers." *Valley Forge*, 454 U.S. at 476.

With these points of departure, I respectfully concur.

A true Copy:

      Teste:

                    _____
                    *Clerk of the United States Court of*
                       *Appeals for the Seventh Circuit*